**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

zIT CONSULTING GMBH,

        Plaintiff,

v.                                                               Case No. 6:15-cv-1012-Orl-37KRS

BMC SOFTWARE, INC.,

        Defendant.
_____

**ORDER**

This cause is before the Court on the following matters:

(1)     BMC Software, Inc.'s Motion to Dismiss zIT Consulting GmbH's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) and 35 U.S.C. Section 101 (Doc. 27), filed September 8, 2015;

(2)     Defendant BMC Software, Inc.'s Motion to Transfer Venue to the Southern District of Texas Pursuant to 28 U.S.C. § 1404(a) (Doc. 29), filed September 22, 2015; and

(3)     Plaintiff zIT Consulting GmbH's Response in Opposition to Defendant BMC Software, Inc.'s Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) and 35 U.S.C. § 101 (DKT. 27) (Doc. 32), filed October 2, 2015;

(4)     Plaintiff's Response in Opposition to Defendant's Motion to Transfer (Doc. 35), filed October 9, 2015;

(5)     BMC Software, Inc.'s Motion for Leave to File a Reply in Support of Its Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

and 35 U.S.C. § 101 (Doc. 34), filed October 9, 2015; and

(6)     Plaintiff's Opposition to Defendant's Motion for Reply (DKT. 34) (Doc. 38),

filed October 23, 2015.

## BACKGROUND

This patent infringement action—which grows increasingly complex with each passing day—is pending between two companies with a history of business dealings concerning efforts to develop enterprise software ("**System Software**") to reduce licensing costs for users of IBM's "System z" mainframe computer system. (*See* Doc. 1, ¶ 5, 6, 9, 11, 12; Doc. 35, p. 2; Doc. 45, ¶ 5 & pp. 4–5, 11–16.) The parties executed mutual non-disclosure agreements ("**NDA**") in November 2011 ("**2011 NDA**") and April 2013 ("**2013 NDA**"), and they met several times in Germany and Texas; however, they failed to reach an agreement. (*See* Doc. 30-1, ¶ 14; Doc. 35-1, ¶ 6; *see also* Doc. 45-1 (2011 NDA); Doc. 45-2 (2013 NDA).) Instead, each party began selling its own System Software—Plaintiff zIT Consulting GmbH ("**zIT**") named its product "zDynaCap" ("**zCap**") (*see* Doc. 1, ¶ 6), and Defendant BMC Software, Inc. ("**BMC**") named its product "Intelligent Capping for zEnterprise (iCap)" ("**iCap**") (*see id.* ¶ 13).[1] Both products are allegedly covered by U.S. Patent No. 8,904,405 ("**'405 Patent**") and U.S. Patent No. 9,038,090 ("**'090 Patent**"). (*See id.* ¶¶ 7, 8, 12; *see also* Doc. 35-1, ¶¶ 2, 5.)

The '405 and '090 Patents ("**Patents-in-Suit**") are both "System and Method for Managing Mainframe Computer System Usage." (*See* Doc. 1-1, pp. 1–27.) The Patents-in-Suit also have identical specifications, which include the following summary:

---

[1] The parties essentially accuse each other of product development through corporate espionage, while alleging that they developed their own products through entirely independent effort. (*See* Docs. 1, 45.)

In mainframe computer system, workload tasks are accomplished using a logically partitioned data processing system, where the partitioned data processing system is divided into multiple logical partitions. In a system and method managing such a computer system, each running workload tasks that can be classified based on time criticality, and groups of logical partitions can be freely defined. Processing capacity limits for the logical partitions in a group of logical partitions based upon defined processing capacity thresholds and upon an iterative determination of how much capacity is needed for time critical workload tasks. Workload can be balanced between logical partitions within a group, to prevent surplus processing capacity being used to run not time critical workload on one logical partition when another logical partition running only time critical workload tasks faces processing deficit.

(*Id.* at 15.) In describing a preferred embodiment of the invention, the Patents-in-Suit identify "the IBM System z platform" as "the preeminent contemporary example of third-party-provided mainframe computer systems and services." (*Id.* at 10, 24.) Finally (and most critically), the Patents-in-Suit recite a total of thirty-six claims—twenty-nine in the '405 Patent, and seven in the '090 Patent. (*Id.* at 13–14, 27.)

zIT is the record owner (by assignment) of the Patents-in-Suit. (*See id.* at 1, 15.) One month after the '090 Patent issued,[2] zIT filed its one-count patent infringement Complaint against BMC in this Court. (Doc. 1.) zIT demands injunctive relief, compensatory damages, "treble damages, attorneys' fees, and costs," based on BMC's alleged infringement of the Patents-in-Suit. (*See id.* ¶¶ 6, 13–16, 18–29, C–F.)

BMC answered the Complaint and asserted a Counterclaim and eleven affirmative defenses. (*See* Doc. 45.) In its thirteen-count Counterclaim, BMC alleges that zIT is liable for "misappropriation and misuse of trade secrets and confidential information," breach of the NDAs, fraud, conversion, and tortious interference with prospective business relations. (*See id.* ¶¶ 42–76, 83–92.) BMC also requests judicial

---

[2] The '090 Patent issued on **May 19, 2015**, and the '405 Patent issued on **December 2, 2014**—with a priority date of **March 6, 2013**. (*See* Doc. 1-1, pp. 1, 15.)

declarations concerning: (1) BMC's alleged inventorship of the Patents-in-Suit (*see id.* ¶¶ 77–82, 93–99); (2) zIT's alleged inequitable conduct and lack of standing (*see id.* ¶¶ 100–12); and (3) non-infringement, invalidity, and unenforceability of the Patents-in-Suit (*see id.* ¶¶ 113–23). Affirmative defenses two through eight largely echo the declaratory relief requested in the Counterclaim. (*See id.* at 4–8.)

Both parties filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docs. 27, 46.) BMC argues that the Court should dismiss the Complaint because the Patents-in-Suit claim ineligible subject matter in contravention of 35 U.S.C. § 101. (Doc. 27 ("**BMC's MTD**").) zIT responded (Doc. 32), and then moved to dismiss the Counterclaim because it is a "shotgun" pleading and contains only implausible claims for relief. (*See* Doc. 46 ("**zIT's MTD**").) BMC has not yet responded to zIT's MTD, and the deadline to do so has not yet passed.[3] (*See* Doc. 49.) BMC's MTD is fully-briefed. (*See* Doc. 32; *see also* Docs. 34, 38.)

Noting that this District is not zIT's home forum or the locus of the parties' dispute, and contending this action would be more conveniently litigated near BMC's headquarters in Houston, Texas ("**Houston HQ**"), BMC also moved pursuant to 28 U.S.C. § 1404(a) to transfer this action to the U.S. District Court for the Southern District of Texas ("**Texas District**"). (Doc. 29 ("**Venue Motion**").) zIT opposes transfer. (*See* Doc. 35; *see also* Docs. 37, 38.)

This Order addresses the sufficiency of the parties' pleadings, BMC's § 101 argument, and the Venue Motion. For the reasons set forth below, the Court finds that: (1) the Complaint and the Counterclaim are due to be dismissed as shotgun pleadings,

---

[3] Because the Counterclaim is a classic shotgun pleading, which the Court is obligated to dismiss *sua sponte*, the Court will address zIT's MTD without waiting for BMC's response. (*See infra*, THE PLEADINGS, Part A.)

and the parties will be afforded an opportunity to replead; (2) BMC's § 101 arguments were prematurely raised and may be reasserted with leave of the Court after development of the record;[4] and (4) the Venue Motion is due to be denied without prejudice.

## THE PLEADINGS

### A.    Pleading Requirements

Federal Rules of Civil Procedure 8 and 10 require that all pleadings include "short and plain" statements of the pleaders' claims set forth in "numbered paragraphs each limited as far as practicable to a single set of circumstances." *See* Fed. R. Civ. P. 8(a), 10(b); *see also Kabbaj v. Obama*, 568 F. App'x 875, 879 (11th Cir. 2014). Allegations must be "simple, concise, and direct" (Fed. R. Civ. P. 8(d)(1)), and pleaders should not use mere labels, legal conclusions, or formulaic recitation of the legal elements of a claim. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, a viable pleading must provide factual allegations sufficient to "state a claim for relief that is plausible on its face." *See id.* at 557 (noting that a pleading is deficient if it tenders "naked assertions" without "factual enhancement"); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 672, 678–79 (2009).

When a pleader "fails to follow Rules 8 and 10," the resulting pleading "may be classified as a shotgun pleading." *Hickman v. Hickman*, 563 F. App'x 742, 744 (11th Cir. 2014); *see Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015) (defining a "shotgun pleading" as a pleading that violates "either Rule

---

[4] Dismissal of the Complaint as a shotgun pleading resolves BMC's MTD. Nonetheless, in an effort to facilitate the orderly and efficient resolution of this action, the Court has addressed the parties' arguments concerning the appropriate time to raise § 101 issues. (*See infra* THE PLEADINGS, Part B.)

8(a)(2) or Rule 10(b), or both"). Shotgun pleadings take many forms, the most common being a pleading "containing multiple counts, where each count adopts the allegations of all preceding counts." *See Weiland*, 792 F.3d at 321–23; *Ferrell v. Durbin*, 311 F. App'x 253, 259 (11th Cir. 2009). Failing to plead "discrete claims" in "separate counts" is another form of shotgun pleading. *See Lacroix v. W. Dist. of Ky.*, No. 14-15276, 2015 WL 5673018, at *1–*2 (11th Cir. Sept. 28, 2015); *Kennedy v. Bell S. Telecomm., Inc. (AT&T)*, 546 F. App'x 817, 818, 820 (11th Cir. 2013) (recognizing a "one-claim-per-count rule" under Rule 10(b)); *Ledford v. Peeples*, 657 F.3d 1222, 1239 (11th Cir. 2011) (noting that shotgun pleadings lump "claims together in one count").

The U.S. Court of Appeals for the Eleventh Circuit warns that when cases are not "pled clearly and precisely" in accordance with the requirements of Rules 8 and 10, "issues are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants suffer, and society loses confidence in the court's ability to administer justice." *See Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. College*, 77 F.3d 364, 367 (11th Cir. 1996); *see also Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002). Heeding this warning, district courts must strike or dismiss deficient pleadings—especially shotgun pleadings. *See Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1333 (11th Cir. 1998); *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1127–28 (11th Cir. 2014) (criticizing district court for failing to police shotgun pleadings).

Here, both parties filed shotgun pleadings in derogation of Rules 8 and 10. (*See* Docs. 1, 45.) The thirty-page Counterclaim is a quintessential shotgun pleading in that it incorporates allegations in preceding counts in each of following thirteen counts. *See Weiland*, 792 F.3d at 1321–23. The eight-page Complaint is a less common—but

equally problematic—shotgun pleading in that it improperly lumps numerous distinct claims and legal theories together in a single count and provides little more than labels and legal conclusions.[5] *See Lacroix*, 2015 WL 5673018, at *1–*2. Left unchecked, the parties' improper pleadings will complicate appellate review, impede the administration of justice, foster unnecessary expense, and prolong the confusion and complexity of the issues raised by the parties. *See Anderson*, 77 F.3d at 367; *see e.g. Johnson*, 162 F.3d at 1333 (noting that all may be "lost" if a district court fails to "demand repleader" of shotgun pleading). Accordingly, both the Complaint and the Counterclaim are due to be dismissed. The parties will be afforded opportunities to properly articulate their claims in amended pleadings.

**B.   35 U.S.C. § 101**

Explicitly, § 101 provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." Implicitly, § 101 also provides that "abstract ideas are not patentable" ("**Abstract Idea Exception**"). *See Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013). Patent eligibility under § 101 "is an issue of law" that may turn on "factual questions." *See Joao Bock Transaction Sys., LLC v. Fidelity Nat'l Info. Servs., Inc.*, No. 3:13-cv-223-J-32JRK, 2015 WL 4743669, at *1 (M.D. Fla. Aug. 10, 2015) (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 94 (2011)).

---

[5] zIT's single count seemingly concerns all thirty-six claims from the two Patents-in-Suit and unspecified violations of at least three distinct statutory provisions—35 U.S.C. § 271(a) (concerning direct infringement), § 271(b) (concerning induced infringement), and § 271(c) (concerning contributory infringement). (*See* Doc. 1.)

Faced with an Abstract Idea Exception challenge to computer-related system and method claims, the U.S. Supreme Court recently summarized the analytical framework for a § 101 challenge. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355–59 (2014) (discussing *Bilski v. Kappos*, 561 U.S. 593, 609 (2010)). First, ask "whether the claims at issue are directed to a patent-ineligible concept." *Id.* at 2354–56. If so, then consider "the elements of each claim both individually and 'as an ordered combination'" to determine whether an 'inventive concept'" is claimed "sufficient to 'transform' the claimed abstract idea into a patent-eligible" invention. *See id.* at 2356–59 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1297 (2012)). Applying these two steps, the *Alice* Court held that the claims did not pass the § 101 threshold because, viewed as a whole, the claim elements recited "the concept of intermediated settlement as performed by a generic computer," and viewed separately, "the function performed by each step" of the claimed process was "purely conventional." *See id.*

In recent years—especially after *Alice*—§ 101 and the Abstract Idea Exception have significantly impacted patent litigation. The trend—especially in cases like this one where the method and system claims at issue relate to software and computers—is to carefully scrutinize claims under § 101 at the earliest possible stage of litigation.[6] *See*

---

[6] *E.g. Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) (affirming grant of alleged infringer's Rule 12(b)(6) motion based on § 101 where claim construction was unnecessary and patentee did not dispute that subset of claims was "representative" of remaining claims); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (affirming order granting judgment on the pleadings that computer-related patent claims covering creation of a "transaction performance guaranty" did not satisfy § 101); *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008 (Fed. Cir. 2014) (affirming district court's claim construction and § 101 rejection of method claims that recited "a generic computer implementation" of an abstract idea concerning bingo game management); *Accenture Global Servs.*,

*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715–16 (Fed. Cir. 2014) (affirming dismissal of complaint based on § 101 challenge to patent claims directed to "the abstract idea of showing an advertisement before delivering free content" on the Internet).[7] *But see DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (affirming district court's post-trial rejection of § 101 challenge to claims that specified "how interactions with the Internet are manipulated to yield a desired result" different from the "conventional sequence of events").

Based on five "representative" claims—independent claims 1, 14, 20, and 25 from the '405 Patent and claim 1 from the '090 Patent ("**Representative Claims**")— BMC argues that the Court should entirely dismiss this action based on the Abstract Idea Exception because the Patents-in-Suit fail to add an "inventive concept" to the "age-old economic practice" of "adjusting limits on how much work is to be performed based on both the cost of the work and the demand for the work." (*See* Doc. 27, p. 5.) Countering that the Patents-in-Suit "unquestionably claim patent-eligible subject matter," zIT argues that the Court should deny BMC's MTD because it is premature, it

---

*GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344–45 (Fed. Cir. 2013) (affirming summary judgment order rejecting, under § 101, system claims directed to the abstract idea of 'generating tasks [based on] rules . . . to be completed upon the occurrence of an event'" in a computer environment within the insurance industry); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1334 (Fed. Cir. 2012) (holding that § 101 was not satisfied where asserted claims recited a "computer aided" use of a "clearinghouse" in car loan application process).

   [7] In *Ultramercial*, the Honorable Haldane Mayer issued a concurrence emphasizing that § 101 issues should be addressed "at the outset of litigation." *See* 772 F.3d at 718–19. The *Ultramercial* concurrence also provides that "no presumption of eligibility should attach when assessing" claims under § 101. *Id.* at 720. The presumption of validity arises by operation of § 282(a), which provides: "A patent shall be presumed valid." To successfully challenge validity based on the "condition[s] of patentability" defenses specified in Part II of the Patent Act—§ 102 (novelty) and § 103 (non-obviousness)—"clear and convincing evidence" is required. *See i4i Ltd.*, 564 U.S. at 92; *see also* 35 U.S.C. § 282(b)(2).

oversimplifies and mischaracterizes the Patents-in-Suit, and it implicates "claim construction issues." (*See* Doc. 32, pp. 2–3, 5–8.)

The Court agrees with zIT that BMC's MTD is premature. First, the Court is not persuaded that BMC's § 101 arguments should be resolved prior to claim construction. Indeed, the Federal Circuit recently noted that it is usually "desirable" to construe the claims before a § 101 analysis. *See Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273–78 (Fed. Cir. 2012) (construing claims where district court did not, and affirming § 101 rejection of claims); *Fuzzysharp Techs. Inc. v. 3dLabs Inc.*, 447 F. App'x 182, 186 (Fed. Cir. 2011) (remanding for § 101 analysis after claim construction). Courts that have resolved § 101 issues prior to claim construction often do so by adopting the patentee's proposed construction for purposes of analysis. Here, that is not an option because BMC raised its § 101 arguments months before zIT's claim construction proposal deadline. (*See* Doc. 40. p. 4.) Further, based on the present shotgun format of the Complaint and zIT's challenge to the Representative Claims, the Court would either have to analyze each of the thirty-six claims at once or do so in a piecemeal fashion. *See Fuzzysharp*, 447 F. App'x at 185 (noting that § 101 analysis requires independent assessment of each patent claim). Both options would result in a colossal waste of judicial recourses.

Although BMC's § 101 arguments may have some potential merit, the Court cannot properly and efficiently address such arguments absent development of the record. At a minimum, BMC should have delayed raising its § 101 arguments until zIT narrowed the claims at issue to ten or fewer and the parties exchanged their respective claim construction proposals as required by the Court's Case Management and Scheduling Order. (*See* Doc. 40. p. 4.) If warranted after those events, BMC may seek

leave to raise the § 101 issue in a discrete and expedited dispositive motion. Leave is necessary because the Court ordinarily requires parties to raise all dispositive arguments in a *single* motion.

## VENUE MOTION

### A.     Standards

Venue "refers to the geographic specification of the proper court or courts for the litigation of a civil action." 28 U.S.C. § 1390(a). In patent infringement actions, venue exists: (1) "in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business" (*id.* § 1400(b)); or (2) in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred" (*id.* § 1391(b)(2)). *See VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1580–84 (Fed. Cir. 1990). When venue lies in multiple courts, the district court may transfer the "action to any other district . . . where it might have been brought" so long as such transfer serves the interest of justice and increases the "convenience of parties and witnesses." *See* 28 U.S.C. § 1404(a); *see also Van Dusen v. Barrack*, 376 U.S. 612, 645–46 (1966) (observing that civil actions should be litigated in the federal venue "called for in the particular case by considerations of convenience and justice").

A party seeking transfer of a patent action from this Court must establish that: (1) the plaintiff could have filed the action in the transferee court; and (2) the action will be more conveniently litigated in the transferee court. *See In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989); *see also In re Dell Inc.*, 600 F. App'x 728, 729 (Fed. Cir. 2015). To determine whether the second requirement is met, courts must conduct a "complex inquiry that takes into account several competing public and private

interests." *See Esfeld v. Costa Corciere, S.P.A.*, 289 F.3d 1300, 1311 (11th Cir. 2002).

The U.S. Court of Appeals for the Eleventh Circuit has identified the following non-exclusive factors courts must consider as part of the second convenience inquiry[8]: (1) the weight accorded to the plaintiff's choice of forum; (2) the locus of operative facts; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the convenience of the witnesses; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the convenience of the parties; (7) the parties' relative means; (8) a forum's familiarity with the governing law; and (9) "trial efficiency and the interests of justice." *See Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005); *see also Wilson v. Island Seas Invs., Ltd.*, 590 F.3d 1264, 1269–70 (11th Cir. 2009) (identifying viewing premises and enforceability of judgment as additional factors pertinent to a *forum non conveniens* issue). District courts have considerable discretion in assessing these factors. *See Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 654 (11th Cir. 1993) (noting that district courts' venue decisions are upheld absent a clear abuse of discretion).

## B.    The Record Evidence

zIT is a German company with its principal place of business in Jade, Germany. (Doc. 35-1, ¶¶ 3, 4), and BMC is a Delaware corporation with its principal place of business in Houston, Texas (Doc. 30-1, ¶ 5.) The parties do not dispute that venue is proper in this District, and zIT concedes that it could have filed this action in the Texas

---

[8] Although Eleventh Circuit law is controlling, venue issues in patent actions are resolved by the U.S. Court of Appeals for the Federal Circuit. *See In re Mayfonk, Inc.*, 554 F. App'x 943, 943 (Fed. Cir. 2014) (applying Eleventh Circuit law when resolving challenge to transfer order); *see also In re Toyota Motor Corp.*, 747 F. 3d 1338, 1339 (Fed. Cir. 2014) (noting the Federal Circuit's practice of granting writs of mandamus to correct a transfer that results from a district court's clear abuse of discretion).

District. (*See* Doc. 35, p. 5 n.1; *see also* Doc. 1, ¶ 4; Doc. 45, ¶ 4.) Thus, the venue dispute is limited to whether the balance of the convenience factors support transfer.

### 1.   BMC's Evidence

BMC filed two declarations in support of its Venue Motion. Both declarants are BMC employees who: (1) work in the business unit where BMC manages all of its design, development, marketing, and sales activities related to iCap (the "**ZSO Unit**"); and (2) were involved in the pre-suit business dealings with zIT, which are referenced in the pleadings ("**Business Dealings**"). (*See* Docs. 30-1, 30-2.) Declarant John Adams ("**Adams**")—who currently resides in Sugarland, Texas—is "Vice President and General Manager" of the ZSO Unit, with responsibility for quality assurance, product development, strategy, and oversight of the teams responsible for "operations and prior and current development of iCap." (*See* Doc. 30-2, ¶¶ 2, 4.) Declarant John McKenny ("**McKenny**")—who currently resides in Houston, Texas—is "Vice President of Solutions Marketing and Customer Support" for the ZSO Unit, and he is "familiar" with "marketing, sales, finance, and accounting" related to iCap. (*See* Doc. 30-1, ¶¶ 2, 4.)

### a.   The Business Dealings

According to BMC, no communications or dealings with zIT occurred outside of Texas and Germany, and none of the persons with knowledge of the Business Dealings are in Florida;[9] rather, BMC's prospective witnesses concerning the Business Dealings are in Texas and California. (*See* Doc. 30-1, ¶¶ 2, 14–17; Doc. 30-2, ¶¶ 2, 14–18, 23.) For instance, two of the persons specifically referenced in the Complaint as recipients of

---

[9] zIT alleges that it disclosed "proprietary" information to John Adams, John McKenny, Andrew Burger, Neil Blagrave, Edward Williams, Paul Spicer, Phat Tran, Dave Davies, Steve Feeney, Simon Chang, Fred Novakov, Ilan Cohen, Nataliya Musayelyan, Yifat Oren, and David Shipper. (Doc. 1, ¶¶ 11–12.)

information from zIT—Neil Blagrave ("**Blagrave**") and Andrew Burger ("**Burger**")—reside in Austin and Houston, Texas, although Burger is no longer a BMC employee. (*See* Doc. 30-1, ¶¶ 15, 16.)

Adams declares that product development manager David Hilbe ("**Hilbe**") and iCap developers Dave Davies ("**Davies**") and Boris Glinis ("**Glinis**") also were "involved" in the Business Dealings, which included: (1) two events attended by Adams, McKenny, and Blagrave—a 2012 presentation by zIT at Houston HQ and a 2012 webinar (Doc. 30-2, ¶¶ 14–16); (2) another zIT webinar in June 2013, which was attended by Blagrave and Hilbe (*id.* ¶¶ 16, 18); and (3) a meeting with zIT in Germany in December 2011, which was attended by McKenny (*id.* ¶ 15). (*See id.* ¶ 23 (declaring that another disclosure referenced in the Complaint was a "public webinar available on the Internet").) Hilbe resides in Houston, Davies resides in San Jose, California, and Glinis "splits his time between Boston, Massachusetts and Israel." (*See id.* ¶ 7.)

### b.    Development of iCap

According to Adams—who is the person at BMC primarily responsible for authorizing and managing development of iCap—none of the current or early design and development work related to iCap was conducted in Florida, and none of BMC's employees responsible for the current or the early design and development of iCap reside in Florida. (*See* Doc. 30-2, ¶¶ 7, 9, 14, 19.) Rather, "BMC's prior and current design and development efforts related to iCap have always been managed and directed" from Houston HQ. (*See id.* ¶ 6.)

The current manager of BMC's iCap development team—Dale Stroyick ("**Stroyick**")—is located in Houston, but current team members are not. (*See id.* ¶¶ 9, 10.) Three team members are in San Jose, California, and another member—Ed

Williams ("**Williams**")—resides in Nevada (*see id.* ¶ 8) and BMC's Lead Product Manager for iCap—Paul Spicer ("**Spicer**")—resides in California. (*See id.* ¶ 10.) The early iCap development team included:

> (1)     Blagrave—who developed "the business case for BMC's creation of a cost optimization solution, which" became iCap and was the iCap product manager until Spring of 2015 (*see id.* at ¶¶ 7, 16, 22);
>
> (2)     "former lead developer and product line manager" Steve Degrange ("**Degrange**")—who currently resides in San Jose, California (*id.* at ¶ 8);
>
> (3)     development project lead Phat Tran ("**Tran**")—who also currently resides in San Jose (*id.*); and
>
> (4)     developer Ed Williams ("**Williams**")—who currently resides in Nevada (*id.*).

In addition, Hilbe oversaw "management of the development team responsible for iCap until 2013" (*see id.* ¶ 18), and Burger "assisted the development team in assessing alternatives to development of iCap." (*See id.* 17, 21.)

### c.     Sales, Marketing, and Finance for iCap

BMC currently markets and sells iCap to new and existing customers "across the United States," including to a customer "located within the Southern District of Texas." (*See* Doc. 30-1, ¶ 10.) All of BMC's "employees in charge of iCap" work in the ZSO Unit, which has its "home" in Houston HQ. (*See id.* ¶ 5; Doc. 30-2, ¶ 5.) For instance: (1) "BMC's primary sales operations for iCap are managed and directed from" Houston HQ (*id.* ¶¶ 6, 7–9); (2) "BMC's primary marketing operations for iCap are managed and directed from" Houston HQ, and the "primary decision makers and key witnesses in charge of marketing iCap are located in" Houston HQ (*id.* ¶ 12); (3) "[f]inancial reporting, accounting, and analysis for iCap is conducted primarily at" Houston HQ (*id.* ¶ 13); and

(4) all "quality assurance testing for iCap" is conducted in Houston (Doc. 30-2, ¶ 11).[10]

According to McKenny, no employee located at BMC's office in Tampa, Florida, is "involved in marketing or sales of iCap." (Doc. 30-1, ¶ 18.) McKenny also denies that BMC conducts any of the following activities in Florida concerning iCap: (1) marketing and sales operations (*id.* ¶¶ 6, 12); (2) sales training (*id.* ¶ 9); (3) sales analysis, strategy, and forecasting (*id.* ¶ 8); and (4) "financial reporting, accounting, and analysis" (*id.* ¶ 13). (*See id.* (denying that BMC has any iCap marketing campaign specifically for Florida).) These activities and others concerning iCap are conducted at Houston HQ. (*See id.* ¶¶ 2, 5–13.)

## 2.    zIT's Evidence

In opposing transfer, zIT relies on a single declarant, who is a named inventor of the Patents-in-Suit and zIT's Chief Executive Officer—Johannes Peeters ("**Peeters**").[11] (*See* Doc. 35-1.) Peeters advises that zIT "is a small German software company" with eight employees and eight independent contractors. (*Id.* ¶¶ 3–4.) According to Peeters, Orlando, Florida, is the center of most of zIT's "commercial activity in the United States." (*Id.* ¶ 4). Peeters points to a contract that zIT entered in 2013, which provides that the marketing, sales, distribution, installation, and support of zCap will be handled by a corporation based in Orlando—Enterprise Systems Associates, Inc. ("**ESAi**"). (*Id.* ¶ 5.)

---

[10] Further, Houston HQ is the workplace for: (1) BMC's Vice President of Strategic Marketing—Saar Shwartz (*id.* ¶ 12); (2) "BMC's VP of Finance"—David Dye ("**Dye**") (*id.* ¶ 13); (3) BMC's "Director of Sales Operations"—Marc Chagnon ("Chagnon") and its Area Vice President of Sales—Terry Gast ("**Gast**") (*id.* ¶ 7); (4) seven iCap sales specialists and account managers (*see id.* ¶ 6); and (5) the person responsible for quality assurance—Archie Vaughn ("**Vaughn**") (*see* Doc. 30-2, ¶ 11).

[11] zIT also filed several unauthenticated documents, which appear to be printed from the Internet. (*See* Doc. 35-4, 35-5, 35-6; *see also* Doc. 35-2.) These documents confirm points that BMC does not dispute—that it maintains an office in Tampa, Florida, and it conducts business in this District. (*See* Doc. 30-1, ¶ 18; Doc. 30-2, ¶¶ 19, 20.)

Peeters also notes that: (1) when he travels to the United States, he spends most of his time in Orlando (*id.*); (2) one of the largest customers of zCap—Lockheed Martin Corporation—is in Florida (*see id.* ¶ 7); and (3) the Patents-in-Suit were prosecuted by a "patent attorney in Orlando" (*id.* ¶ 3).[12] Finally, Peeters advises that a third party witness who resides in Jacksonville, Florida—Jeff Crews ("**Crews**")—"can provide information concerning" zIT's alleged lost sales, and BMC's alleged knowledge of the Patents-in-Suit. (*Id.* ¶ 4.)

## C.    Convenience Analysis

### 1.    zIT's Choice of Forum (Disfavors Transfer)

Along with witness convenience, plaintiff's forum choice is most crucial to the § 1404 analysis. *See Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996). The deference accorded to a plaintiff's forum choice varies depending on where the events pertinent to the action occurred and whether the plaintiff filed the action in its home forum. *See Game Controller Tech. LLC v. Sony Computer Entm't Am. LLC*, 994 F. Supp. 2d 1268, 1272 (S.D. Fla. 2014). Great weight is accorded when a plaintiff files an action in its home forum. *See Huntley v. Chicago Bd. of Options Exch.*, No. 1:15-cv-1945-AT, 2015 WL 5672218, at *5 (N.D. Ga. Sept. 23, 2015). Less weight is afforded when a plaintiff files outside its home forum or in a court with little or no connection to the parties' dispute. *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007); *Intellectual Ventures I, LLC v. Motorola Mobility, LLC*, No. 13-61358-CIV, 2014 WL 129279, at *4 (S.D. Fla. Jan. 14, 2014) ("[A] non-resident plaintiff's choice of forum is generally accorded less weight.").

---

[12] The prosecuting attorney identified on the Patents-in-Suit—Allen, Dyer, Doppelt, Milbrath & Gilchrist—also represent zIT in this action. (*See* Doc. 1-1, p. 15.)

Here, zIT concedes that this District is not its home forum but argues that the Court must defer to its choice to file suit here because: (1) BMC is registered to do business in Florida, it has significant ties to Florida, and it infringed the Patents-in-Suit in this District when it offered to sell iCap to prospective customers in Florida (*see* Doc. 35, pp. 2–3; Doc. 35-1, ¶ 8; Docs. 35-3, 35-4, 35-5); (2) the Patents-in-Suit were prosecuted by a patent attorney in this District (*see* Doc. 35-1, ¶ 3); (3) most of zIT's "commercial activity in the United States is centered" in this District; and (4) since BMC's release of iCap, Florida is where many zCap sales have been lost (*see id.* ¶ 4).

It is plain that zIT's decision to file suit in this District was not random or done solely to burden or harass BMC. zIT's connections to this District—while not extensive—are genuine and have some relation to this action.[13] Thus, the Court will defer to zIT's choice. *See Andersons, Inc. v. Enviro Granulation, LLC*, No. 8:13-CV-3004-T-33MAP, 2015 WL 2025590, at *7 (M.D. Fla. Apr. 30, 2015) (giving "some weight" to plaintiff's decision to sue outside its home forum, but in a court with a "meaningful and legitimate connection to the parties and the operative facts").

### 2.    Locus of Operative Facts (Favors Transfer)

For purposes of patent infringement claims, the locus of operative facts occur where the alleged infringement occurred, and the "center of gravity" is "where the accused product was designed and developed." *See Motorola Mobility, Inc.*, *v. Microsoft Corp.*, 804 F. Supp. 2d 1271, 1276 (S.D. Fla. 2011); *see also In re Mayfonk, Inc.*, 554 F. App'x at 944; *R.W.D. Innovative Specialty Trims LLC v. Oehme*, No. 4:12-cv-599-WS/CAS, 2013 WL 5460277, at *2 (N.D. Fla. July 18, 2013) (transferring case to

---

[13] It appears that BMC's affirmative defenses and Counterclaim may increase the importance of activities in this District concerning commercialization of iCap and prosecution of the Patents-in-Suit.

forum that was the center of gravity for the infringing activity). The center of gravity for the infringement claims is the Texas District, and BMC's sales efforts in this District do not weigh against transfer because iCap is sold nationwide. *See In re Acer Am. Corp.*, 626 F.3d 1252, 1256 (Fed. Cir. 2010). Thus, the Court weighs this factor in favor of transfer.

### 3.    Location of Relevant Documents (Neutral)

"In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location." *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009); *see also Suomen Colorize Oy v. DISH Network L.L.C.*, 801 F. Supp. 2d 1334, 1339 (M.D. Fla. 2011). On the other hand, courts often give neutral weight to this factor due to the ready availability of electronically-stored information. *See Fitalert Corp. v. Intl. Bus. Machines Corp.*, No. 15-22845-CIV-GAYLES, 2015 WL 9474640, at *3 (S.D. Fla. Dec. 29, 2015). *But see In re Toa Techs., Inc.*, 543 F. App'x 1006, 1009–10 (Fed. Cir. 2013) (stating that the prevelance of digitally stored data "does not negate the significance" of litigating in proximity to physical evidence).

BMC advises that the bulk of the pertinent documentary evidence—including documents related to the "design, operation, and functionality of iCap" and the source code for iCap—is accessible from Houston HQ, but is inaccessible from Florida unless a BMC representative travels to Florida to provide authorization. (*See* Doc. 30-2, ¶ 12 (explaining that the source code "resides in" BMC's "Update Facility Datasets (SMUF)" and the remaining documents reside on BMC's "SharePoint server").) BMC does not claim that these access requirements are unalterable or that it could not provide the

requisite authority to a BMC employee or other BMC representative currently in Florida. Because it is apparent that pertinent documents are electronically-stored, and it is not apparent that accessing such documents in Florida would be unduly burdensome, this factor is neutral.

### 4. Convenience of Witnesses (Slightly Favors Transfer) Compulsion of Unwilling Witnesses (Neutral)

With respect to the patent infringement claims, it appears that the bulk of the necessary prospective witnesses are in the Texas District and in California. (*See supra* VENUE MOTION, Part B.1.) Further, it appears that few—if any—necessary or even important witnesses are located in this District.[14] As such, the witness convenience factor weighs in favor of transfer; however, only slight weight is assigned because the prospective witnesses identified by BMC thus far—except Burger—are BMC employees, and the Court has heard nothing from Burger regarding the burden to him (if any) to travel from Texas for this action. Finally, the record includes no indication that any specific witness beyond the subpoena power of this Court or the Court in the Texas District is unwilling to testify. Thus, the Court assigns no weight to the compulsion of unwilling witness factor.

---

[14] Peeters identified Crews and employees of ESAi as potential witnesses. (*See* Doc. 35-1, ¶¶ 4–5.) In addition, zIT argues that Lockheed Martin is a potential witness to refute BMC's obviousness defense and BMC's former Southeast Sales Manager—Michael Addeo ("**Addeo**")—may be a potential witness concerning damages and market conditions. (*See* Doc. 35, pp. 7–9.) However, as with Burger, the Court has no evidence from these potential witnesses concerning the inconvenience—if any—that they may suffer if this action is tried in the Texas District. Further, the Court is not persuaded that the broad issues to be addressed by Crews, Addeo, and Lockheed Martin must be addressed by them. Finally, while the ESAi employees may have information pertinent to defense of the Counterclaim, it is unclear what they might add with regard to the patent infringement claims.

### 5. The Parties' Convenience (Slightly Favors Transfer)
### The Parties' Relative Means (Slightly Disfavors Transfer)

Although it is apparent that zIT has far less financial resources than BMC,[15] zIT does not contend that its smaller resources would limit its ability to litigate this action in the Texas District. (*See* Doc. 35-1.) In contrast, Adams and McKenny both declare that the disruption to BMC's ongoing business operations will be substantial if and when the "critical" persons responsible for its iCap business are required to travel to Florida from Texas or California to provide discovery and trial testimony for this action. (*See* Doc. 30-1, ¶ 19; Doc. 30-2, ¶ 24.) They declare further that the disruption would be "substantially minimized" if such persons—who presumably include at least Adams, McKenny, Williams, Blagrave, Stroyick, Spicer, Hilbe, and Vaughn—could participate in this action from Houston HQ. (*See* Doc. 30-1, ¶ 19; Doc. 30-2, ¶ 24.) After weighing the evidence, the Court finds that the parties' relative means factor weighs slightly against transfer, but the parties' convenience factor weighs slightly in favor of transfer.

### 6. Governing Law (Favors Transfer)

Unless a court has construed the particular patent at issue, the governing law factor usually has no impact on a transfer analysis in patent actions because federal district courts consistently apply federal patent law. *See In re Apple, Inc.*, 581 F. App'x 886, 889 (Fed. Cir. 2014) (factoring courts' experience with patents at issue); *Fitalert Corp.*, 2015 WL 9474640, at *5. There is no indication here that the Patents-in-Suit have previously been construed in the Texas District or in this District. Nonetheless, the governing law factor is not completely neutral because the parties' respective

---

[15] (*Compare* Doc. 35-1, ¶¶ 3–4 (declaring that zIT is a small German company with eight employees and eight independent contractors); *with* Doc. 45, p. 10, ¶ 5 (alleging that BMC is "one of the world's leading software providers"); *see also* Doc. 35-1; Doc. 35-5, p.3; , )

allegations concerning the 2011 NDA and 2013 NDA implicate Texas law and Delaware law.[16] In comparison to this Court, the courts in the Texas District undoubtedly have more expertise in Texas law and more interest in policing allegations of corporate espionage that allegedly occurred in Texas and involved a Texas resident. Thus, the governing law factor weighs in favor of transfer.

### 7.    Trial Efficiency and the Interests of Justice (Neutral)

At this early stage of the litigation and based on the parties' briefing, the Court can assign no weight to the trial efficiency and interests of justice factor.

### 8.    Balancing the Factors

Having balanced the pertinent convenience factors based on the case-specific factors discernable from the evidence and the pleadings, the Court finds that the Venue Motion is due to be denied without prejudice because BMC did not establish that the convenience factors sufficiently weigh in favor of transfer at this time. However, the balance of factors are largely in equipoise, and the Court notes that the matter was presented on a very limited record. BMC's Answer and affirmative defenses (and its shotgun Counterclaim) introduced significant additional issues that were not addressed by the parties in their briefing. Clarification of the issues through improved pleading and early discovery may impact the convenience analysis; thus, the parties are not precluded from raising this issue again on a more developed record.

---

[16] The 2011 NDA provides that "the laws of the State of Texas" shall govern "without regard to conflict of law principles" (Doc. 45-1, ¶ 16), and the 2013 NDA provides that it "shall be exclusively governed by and construed under the laws of the State of Delaware without regard to conflicts-of-law rules or principles." (Doc. 45-2, ¶ 14.) Neither court appears to have an advantage or special interest in applying Delaware law.

**CONCLUSION**

In accordance with the foregoing, it is hereby **ORDERED and ADJUDGED**:

1.      BMC Software, Inc.'s Motion to Dismiss zIT Consulting GmbH's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) and 35 U.S.C. Section 101 (Doc. 27) is **DENIED IN PART AND IS GRANTED IN PART**.

   a.      To the extent that BMC Software, Inc. seeks dismissal of the Complaint as a matter of law based on ineligible subject matter, the Motion (Doc. 27) is **DENIED AS PREMATURE**. After development of the record, Defendant may reassert such argument in an appropriate motion if warranted.

   b.      To the extent that BMC Software, Inc. seeks dismissal of the Complaint for failing to comply with minimum pleading requirements, the Motion (Doc. 27) is **GRANTED**.

2.      BMC Software, Inc.'s Motion for Leave to File a Reply in Support of Its Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) and 35 U.S.C. § 101 (Doc. 34) is **DENIED**.

3.      The Complaint (Doc. 1) is **DISMISSED WITHOUT PREJUDICE**.

4.      On or before **January 25, 2015**, zIT Consulting GmbH may file an Amended Complaint.

5.      Plaintiff zIT's Motion to Dismiss Defendant BMC's Counterclaims (Doc. 46) is **GRANTED**.

6.      The Counterclaim (Doc. 45, pp. 9–37) is **DISMISSED WITHOUT PREJUDICE**.

7.     BMC Software, Inc. may file an Amended Counterclaim with its Answer to the Amended Complaint filed by zIT Consulting GmbH in accordance with Paragraph 4 of this Order.

8.     Defendant BMC Software, Inc.'s Motion to Transfer Venue to the Southern District of Texas Pursuant to 28 U.S.C § 1404(a) (Doc. 29) is **DENIED WITHOUT PREJUDICE**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on January 15, 2016.



ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record