**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **zIT CONSULTING GMBH,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BMC SOFTWARE, INC.,**<br><br>**Defendant.** | **Case No. 6:15-CV-1012-Orl-31KRS**<br><br>**JURY TRIAL REQUESTED** |

**BMC SOFTWARE, INC.'S ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant BMC Software, Inc. ("BMC"), by and through its attorneys, answers the First Amended Complaint for Patent Infringement ("Complaint") of Plaintiff zIT Consulting GmbH ("zIT") as follows. For convenience, BMC uses the same headings used in Plaintiff's First Amended Complaint.

**PARTIES, JURISDICTION AND VENUE**

1. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 1, and therefore denies them.

2. BMC admits that its principal place of business is in Houston, Texas. BMC denies the remaining allegations in paragraph 2.

3. BMC admits that district courts have exclusive jurisdiction of patent cases under 28 U.S.C. §§ 1331 and 1338(a).

4. BMC admits that venue is proper in this Judicial District. BMC denies, however, that venue is convenient for BMC and its witnesses in this District pursuant to 28 U.S.C. § 1404 and asserts that this case should be transferred to the Southern District of Texas, Houston

Division. Pursuant to Dkt. No. 50, BMC intends to renew its motion to transfer venue to that District. BMC denies the remaining allegations in paragraph 4.

## GENERAL ALLEGATIONS

5. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5, and therefore denies them..

6. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 6, and therefore denies them.

7. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 7, and therefore denies them.

8. BMC denies that zIT is the rightful owner of U.S. Patent No. 8,904,405.

9. BMC denies that zIT is the rightful owner of U.S. Patent No. 9,038,090.

10. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 10, and therefore denies them.

11. BMC admits that it obtained knowledge of the Patents-in-Suit upon the filing of zIT's Original Complaint. BMC denies all remaining allegations of paragraph 11, whether express or implied.

12. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 12, and therefore denies them.

13. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 13, and therefore denies them.

14. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 14, and therefore denies them

15. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 15, and therefore denies them.

16. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 16, and therefore denies them.

17. Denied.

18. Denied.

19. Denied.

20. Denied.

21. Denied.

22. Denied.

23. Denied.

**COUNT I**
**Action for Direct Infringement United States Patent 8,904,405**

24. BMC incorporates by reference paragraphs 1-23 above, as if fully set forth herein.

25. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 25, and therefore denies them.

26. Denied.

27. Denied.

28. BMC denies that Plaintiff is the rightful owner of the ‘405 patent and denies that Plaintiff has proper standing to sue for infringement.

29. BMC admits that it gained actual knowledge of the ‘405 Patent upon the filing of zIT’s Original Complaint. BMC denies all remaining allegations of paragraph 29.

30. Denied.

31. Denied.

32. Denied.

33. Denied.

34. Denied.

35. Denied.

BMC denies that zIT is entitled to any relief sought in its prayer for relief. BMC has not directly infringed nor induced infringement of any claims of the ’405 Patent. BMC has not willfully infringed any claims of the ’405 Patent. zIT is not entitled to an injunction, and is not entitled to recover attorneys’ fees, past and future damages, supplemental or enhanced damages, treble damages, costs, prejudgment or post-judgment interest, or any other type of recovery from BMC. zIT’s prayer should, therefore, be denied in its entirety and with prejudice, and zIT should take nothing.

A. Denied.

B. Denied.

C. Denied.

D. Denied.

E. Denied.

F. Denied.

**COUNT II**
**Action for Induced Patent Infringement United States Patent 8,904,405**

36. BMC incorporates by reference paragraphs 1-23 above, as if fully set forth herein.

37. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 37, and therefore denies them.

38. BMC denies that Plaintiff is the rightful owner of the ‘405 patent and denies that Plaintiff has proper standing to sue for infringement.

39. BMC admits that it gained actual knowledge of the '405 Patent upon the filing of zIT's Original Complaint. BMC denies all remaining allegations of paragraph 39.

40. Denied.

41. Denied.

42. Denied.

43. Denied.

44. Denied.

45. Denied.

46. Denied.

47. Denied.

BMC denies that zIT is entitled to any relief sought in its prayer for relief. BMC has not induced infringement of any claims of the '405 Patent. BMC has not willfully infringed any claims of the '405 Patent. zIT is not entitled to an injunction, and is not entitled to recover attorneys' fees, past and future damages, supplemental or enhanced damages, treble damages, costs, prejudgment or post-judgment interest, or any other type of recovery from BMC. zIT's prayer should, therefore, be denied in its entirety and with prejudice, and zIT should take nothing.

A. Denied.

B. Denied.

C. Denied.

D. Denied.

E. Denied.

F. Denied.

## COUNT III
## Action for Contributory Patent Infringement United States Patent 8,904,405

48. BMC incorporates by reference paragraphs 1-23 above, as if fully set forth herein.

49. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 49, and therefore denies them.

50. BMC denies that Plaintiff is the rightful owner of the '405 patent and denies that Plaintiff has proper standing to sue for infringement.

51. BMC admits that it gained actual knowledge of the '405 Patent upon the filing of zIT's Original Complaint. BMC denies all remaining allegations of paragraph 51.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

58. Denied.

BMC denies that zIT is entitled to any relief sought in its prayer for relief. BMC has not contributed to the infringement of any claims of the '405 Patent. BMC has not willfully infringed any claims of the '405 Patent. zIT is not entitled to an injunction, and is not entitled to recover attorneys' fees, past and future damages, supplemental or enhanced damages, treble damages, costs, prejudgment or post-judgment interest, or any other type of recovery from BMC. zIT's prayer should, therefore, be denied in its entirety and with prejudice, and zIT should take nothing.

A. Denied.

B. Denied.

C. Denied.

D. Denied.

E. Denied.

F. Denied.

**COUNT IV**
**Action for Direct Patent Infringement United States Patent 9,038,090**

59. BMC incorporates by reference paragraphs 1-23 above, as if fully set forth herein.

60. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 60, and therefore denies them.

61. Denied.

62. Denied.

63. BMC denies that Plaintiff is the rightful owner of the ‘090 patent and denies that Plaintiff has proper standing to sue for infringement.

64. BMC admits that it gained actual knowledge of the ‘090 Patent upon the filing of zIT’s Original Complaint. BMC denies all allegations of paragraph 64.

65. Denied.

66. Denied.

67. Denied.

68. Denied.

69. Denied.

70. Denied.

BMC denies that zIT is entitled to any relief sought in its prayer for relief. BMC has not directly infringed nor induced infringement of any claims of the ’090 Patent. BMC has not

willfully infringed any claims of the ’090 Patent. zIT is not entitled to an injunction, and is not entitled to recover attorneys’ fees, past and future damages, supplemental or enhanced damages, treble damages, costs, prejudgment or post-judgment interest, or any other type of recovery from BMC. zIT’s prayer should, therefore, be denied in its entirety and with prejudice, and zIT should take nothing.

A. Denied.

B. Denied.

C. Denied.

D. Denied.

E. Denied.

F. Denied.

**COUNT V**
**Action for Induced Patent Infringement of United States Patent 9,038,090**

71. BMC incorporates by reference paragraphs 1-23 above, as if fully set forth herein.

72. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 72, and therefore denies them.

73. BMC denies that Plaintiff is the rightful owner of the ‘090 patent and denies that Plaintiff has proper standing to sue for infringement.

74. BMC admits that it gained actual knowledge of the ‘090 Patent upon the filing of zIT’s Original Complaint. BMC denies all allegations of paragraph 74.

75. Denied.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

80. Denied.

81. Denied.

82. Denied.

BMC denies that zIT is entitled to any relief sought in its prayer for relief. BMC has not induced infringement of any claims of the ’090 Patent. BMC has not willfully infringed any claims of the ’090 Patent. zIT is not entitled to an injunction, and is not entitled to recover attorneys’ fees, past and future damages, supplemental or enhanced damages, treble damages, costs, prejudgment or post-judgment interest, or any other type of recovery from BMC. zIT’s prayer should, therefore, be denied in its entirety and with prejudice, and zIT should take nothing.

A. Denied.

B. Denied.

C. Denied.

D. Denied.

E. Denied.

F. Denied.

**COUNT VI**
**Action for Contributory Patent Infringement of United States Patent 9,038,090**

83. BMC incorporates by reference paragraphs 1-23 above, as if fully set forth herein.

84. BMC is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 84, and therefore denies them.

85. BMC denies that Plaintiff is the rightful owner of the ‘090 patent and denies that Plaintiff has proper standing to sue for infringement.

86. BMC admits that it gained actual knowledge of the '090 Patent upon the filing of zIT's Original Complaint. BMC denies all allegations of paragraph 86.

87. Denied.

88. Denied.

89. Denied.

90. Denied.

91. Denied.

92. Denied.

93. Denied.

BMC denies that zIT is entitled to any relief sought in its prayer for relief. BMC has not contributed to the infringement of any claims of the Patents-in-Suit. BMC has not willfully infringed any claims of the Patents-in-Suit. zIT is not entitled to an injunction, and is not entitled to recover attorneys' fees, past and future damages, supplemental or enhanced damages, treble damages, costs, prejudgment or post-judgment interest, or any other type of recovery from BMC. zIT's prayer should, therefore, be denied in its entirety and with prejudice, and zIT should take nothing.

A. Denied.

B. Denied.

C. Denied.

D. Denied.

E. Denied.

F. Denied.

## JURY TRIAL REQUEST

94. BMC admits that zIT demands a trial by jury, but denies that zIT is entitled to a jury trial for any claims where the law does not provide for such a right.

## BMC'S AFFIRMATIVE DEFENSES

95. Without admitting or acknowledging that it bears the burden of proof, and without waiver, limitation, or prejudice, BMC asserts the following affirmative defenses:

### FIRST DEFENSE – FAILURE TO STATE A CLAIM

96. zIT has failed to state a claim upon which relief can be granted pursuant to 35 U.S.C. § 101, as well as for the reasons set forth herein.

### SECOND DEFENSE – ESTOPPEL AND UNCLEAN HANDS

97. zIT's claims are barred, in whole or in part, by the doctrine of estoppel and unclean hands. In particular, and as discussed further below, BMC shared certain of its trade secrets and confidential information with zIT in and around 2012. BMC took reasonable steps to preserve the confidentiality of that information, including by executing two mutual non-disclosure agreements with zIT in 2011 and 2013. Pursuant to the parties' agreements, zIT had, and continues to have, a duty to keep the information shared by BMC secret, and not to use or disclose such information other than for the benefit of BMC.

98. Despite these obligations, and upon information and belief, zIT disclosed and/or used BMC's trade secrets and confidential information in a manner adverse to BMC and without the express or implied consent of BMC. Specifically, upon information and belief, zIT used BMC's trade secrets and confidential information to develop its own software solution, the zDynaCap product, and has marketed and sold the zDynaCap product to customers without the consent or authorization of BMC. Upon information and belief, zIT also prepared and filed applications for the Patents-in-Suit using BMC's trade secrets and confidential information.

Upon information and belief, zIT then filed this lawsuit, in part, to preclude BMC from using its iCap solution and to coerce BMC to purchase zIT's solution, the zDynaCap product. As set forth in more detail below, however, BMC has an ownership interest in both the zDynaCap product and the Patents-in-Suit, and equity precludes zIT from asserting the Patents-in-Suit against BMC because BMC originally developed all or part of the subject matter disclosed in the Patents-in-Suit.

**THIRD DEFENSE – IMPROPER INVENTORSHIP/OWNERSHIP**

99. Through purposeful violations of its non-disclosure agreements with BMC and other acts described herein, zIT has wrongfully gained property and benefits that rightfully belong to BMC. Specifically, upon information and belief, zIT used BMC's trade secrets and confidential information to develop the zDynaCap product, and has marketed and sold the zDynaCap product to customers without the consent or authorization of BMC. Upon information and belief, zIT also prepared and filed applications for the Patents-in-Suit using BMC's trade secrets and confidential information. Pursuant to the parties' agreements, BMC has a rightful ownership claim to all or portions of the zDynaCap product and the Patents-in-Suit that include or were derived from BMC's trade secrets and confidential information.

100. Further, and upon information and belief, zIT was not the original and first inventor of the subject matter disclosed in the Patents-in-Suit, nor did zIT first discover all or a substantial part of the subject matter disclosed in the Patents-in-Suit. Upon information and belief, the subject matter disclosed in the Patents-in-Suit was created entirely or in substantial part by BMC and was disclosed to zIT pursuant to the parties' non-disclosure agreements. Further, upon information and belief, certain aspects of the subject matter of the Patents-in-Suit that were developed and/or disclosed by zIT are obvious variants of information disclosed by BMC to zIT in confidence prior to the time at which the applications for the Patents-in-Suit were

filed. Accordingly, and for each of the foregoing reasons, zIT was not entitled to obtain protection for the Patents-in-Suit, and they are therefore invalid.

**FOURTH DEFENSE – LACK OF STANDING**

101. As addressed above and discussed in more detail below, and upon information and belief, BMC is an inventor of the Patents-in-Suit and is the sole owner or has an undivided ownership interest in the Patents-in-Suit. In the event the Court does not find the Patents-in-Suit invalid for improper inventorship, zIT is not permitted to assert a claim for patent infringement against an inventor with an ownership interest in the Patents-in-Suit, nor is zIT permitted to initiate actions to enforce the Patents-in-Suit without the consent of all individuals or entities with an ownership interest in the Patents-in-Suit. Accordingly, because BMC is not a plaintiff in this action, zIT did not have standing to initiate this action, and does not have standing to maintain it; therefore, zIT's suit should be dismissed.

102. zIT also lacks standing to sue because the subject matter disclosed in the Patents-in-Suit represents an abstract idea; zIT did not invent the subject matter disclosed in the Patents-in-Suit; and because U.S. Patent No. 9,038,090 was obtained by zIT in violation of 35 U.S.C. 101's prohibition on double patenting.

**FIFTH DEFENSE – INEQUITABLE CONDUCT**

103. Upon information and belief, the Patents-in-Suit are unenforceable due to inequitable conduct on the part of zIT and its representatives with respect to the Patents-in-Suit. Upon information and belief, zIT and its representatives knew that zIT was not the original and first inventor of the subject matter disclosed in the Patents-in-Suit, and that zIT did not first discover all or a substantial part of the subject matter disclosed in the Patents-in-Suit. Upon information and belief, zIT and its representatives were aware that the subject matter disclosed in

the Patents-in-Suit was created entirely or in substantial part by BMC and disclosed to zIT pursuant to the parties' non-disclosure agreements.

104. In particular, and as discussed in more detail below, BMC provided zIT with specifications and a product roadmap in March 2012 to assist zIT in developing a cost optimization solution that would help customers reduce charges associated with their use of IBM's mainframe systems. Johannes Peeters, zIT's CEO and one of the inventors of the Patents-in-Suit, reviewed that specification and, upon information and belief, created a product based on that specification. Upon information and belief, Johannes Peeters also relied on the information provided by BMC to develop the subject matter disclosed in the Patents-in-Suit. Approximately one year after receiving the specifications and product roadmap from BMC, zIT filed for a provisional patent application seeking patent protection on the subject matter disclosed to zIT by BMC, naming Johannes Peeters, among others, as inventors. Because the information provided by BMC discloses and/or directly relates to the subject matter disclosed in the Patents-in-Suit, there is a substantial likelihood that a reasonable patent examiner would have considered the existence of the information provided to zIT by BMC material and important in deciding whether to allow the applications to issue as the Patents-in-Suit.

105. Upon information and belief, despite having knowledge of the information provided by BMC, neither Johannes Peeters nor any of zIT's representatives disclosed the information provided by BMC to zIT to the USPTO despite the fact that the information provided to zIT by BMC is highly material to the patentability of each claim of the Patents-in-Suit and is not cumulative of other prior art. Upon information and belief, zIT and its representatives did not disclose the information provided by BMC to the USPTO because they knew there was a substantial likelihood the patent examiner would find zIT was not the initial

and/or sole inventor of the subject matter disclosed in the Patents-in-Suit and that the information provided by BMC would preclude the Patents-in-Suit from issuing on behalf of zIT. Therefore, upon information and belief, zIT's failure to disclose the information to the USPTO was done with deceptive intent.

106. Additionally, zIT and its representatives—including each of the inventors of the Patents-in-Suit—were aware of zIT's zPriceManager product, zIT's predecessor solution to the zDynaCap product. The zPriceManager product is highly material to the patentability of each claim of the Patents-in-Suit and is not cumulative of other prior art, and zIT did not cite such to the USPTO. There is a substantial likelihood that a reasonable patent examiner would consider the existence of the zPriceManager product—which contains foundational information related to the subject matter disclosed in the Patents-in-Suit—important in deciding whether to allow the applications to issue as the Patents-in-Suit. zIT and its representatives failed to disclose the zPriceManager product to the USPTO during the prosecution of the applications that led to the Patents-in-Suit. Upon information and belief, zIT's failure to disclose the zPriceManager product to the USPTO was done with deceptive intent.

**SIXTH DEFENSE – NON-INFRINGEMENT**

107. BMC is not infringing and has not infringed, either by direct infringement, contributory infringement, inducement of infringement, willful infringement, or otherwise, any valid claim of the Patents-in-Suit, either literally or under the doctrine of equivalents.

**SEVENTH DEFENSE – INVALIDITY**

108. One or more claims of the Patents-in-Suit are invalid for failure to meet one or more provisions of the Patent Laws of the United States, 35 U.S.C § 101 *et seq.*, including, but not limited to, 35 U.S.C §§ 101, 102, 103, and/or 112.

**EIGHTH DEFENSE – DOUBLE PATENTING**

109. The ’090 Patent is unenforceable due to both non-statutory and statutory double patenting. In particular, the asserted claims of the ’090 Patent are anticipated and/or rendered obvious by the claims of the ’405 Patent because the claims are not patentably distinct. 35 U.S.C. 101 provides that an inventor “may obtain a patent.” Because the claims between the ’405 and ’090 Patents are not distinct, under Section 101 the inventors are not entitled to two patents for the same invention. Therefore the ’090 Patent is invalid for statutory double patenting.

**NINTH DEFENSE – PROSECUTION HISTORY ESTOPPEL**

110. To the extent that zIT alleges infringement under the doctrine of equivalents, zIT’s alleged cause of action is barred, including, without limitation, by way of example, under the doctrine of prosecution history estoppel, claim vitiation, and/or recapture. By virtue of statements made, amendments made, and/or positions taken during the prosecution of the applications for the Patents-in-Suit, and any application to which these patents claim priority, zIT is estopped from asserting that the Patents-in-Suit cover or include any accused BMC product or service.

**TENTH DEFENSE – LIMITATION ON DAMAGES AND COSTS**

111. zIT’s claims for damages or costs are statutorily limited by 35 U.S.C. §§ 252, 286, 287, and/or 288, and may additionally be limited by 28 U.S.C. § 1498.

**ELEVENTH DEFENSE –NO EQUITABLE/INJUNCTIVE RELIEF**

112. On information and belief, zIT’s claims for injunctive relief, if any, are barred as a matter of law because any alleged injury is not immediate or irreparable, and zIT has an adequate remedy at law for any alleged injury.

## BMC'S COUNTERCLAIMS

Defendant/Counter-Plaintiff BMC (hereinafter "BMC") hereby asserts the following counterclaims against Plaintiff/Counter-Defendant zIT (hereinafter "zIT") for misappropriation of trade secrets and confidential information, breach of contract, fraud, tortious interference with prospective business relations, and for declaratory relief that BMC is the rightful owner of the zDynaCap product, the Patents-in-Suit, any provisional and pending patent applications that share a priority claim with the Patents-in-Suit, and any other works containing BMC's trade secrets or confidential information or that were derived therefrom. BMC further seeks a declaration that the Patents-in-Suit are invalid for improper inventorship; that BMC is an inventor and owner of the Patents-in-Suit; that BMC has not and does not infringe in any way any valid claims of the Patents-in-Suit; and that each and every claim of the Patents-in-Suit are invalid . In support of the foregoing, BMC would respectfully show the Court as follows:

### THE PARTIES

1. BMC is a Delaware corporation with its principal place of business at 2103 CityWest Boulevard, Houston, TX 77042.

2. According to paragraph 1 of zIT's first amended complaint, zIT is a German company with its principal place of business in Jade, Germany.

### JURISDICTION AND VENUE

3. This action arises under the Patent Laws of the United States, 35 U.S.C § 101 *et seq.*, and there is an actual controversy between the parties with respect to the Patents-in-Suit. This Court also has subject matter jurisdiction over BMC's counterclaims pursuant to 28 U.S.C. §§ 1331, 1332, and 1338, as well as 28 U.S.C. §§ 1367, 2201, and 2202.

4. zIT is subject to personal jurisdiction in this District because zIT availed itself of this jurisdiction by filing the original action in this District. Venue is appropriate in this judicial district under 28 U.S.C. §§ 1391 and 1400(b). However, venue is improper in the district pursuant to 28 U.S.C. § 1404. Pursuant to Dkt. No. 50, BMC intends to renew its motion to transfer venue to this case to the Southern District of Texas, Houston Division.

## RELEVANT FACTS

5. BMC is a pioneer of innovative and cutting-edge enterprise software solutions that serve thousands of customers around the globe, from small and mid-size businesses to the largest companies in the world. Since the company was founded in 1980, BMC has grown to become one of the world's leading software providers.

6. BMC's software enables companies to easily manage, track, and service the ever-increasing number of network servers, computers, printers, software applications, and other computing resources needed across an enterprise, to ensure users' information technology services are not disrupted. BMC's software also facilitates substantial efficiencies and cost savings in its customers' computing systems.

7. BMC became a leader in the design and development of enterprise software solutions because of enormous investments over many years in research and development. From these investments, BMC invented and developed the technologies needed to make modern enterprise software-driven systems possible.

8. In 2011, continuing in its tradition of providing business critical software solutions to its customers, BMC endeavored to create a cost optimization solution that would help customers reduce charges associated with their use of IBM's mainframe systems.

9. Specifically, thousands of businesses and institutions across the United States and the world utilize IBM's mainframe systems and z/OS operating system to run their business critical applications. These entities usually incur monthly licensing costs based on the amount of usage consumed over a four-hour rolling period, with the highest charges incurred at peak processor usage. To reduce these charges, customers are incentivized to manage utilization to avoid spikes in processor usage where possible by increasing processor utilization during slack periods and reducing processor utilization during peak periods.

10. Prior to 2011, BMC had already developed a mainframe cost optimization strategy to reduce licensing costs by offering a suite of software solutions designed to help customers manage mainframe usage. As of 2011, however, many customers were still implementing manual and scripted processes with BMC's solutions to reduce licensing charges and increase the efficiency of their computing systems. In response to demand from its customers, BMC set out to create an automated and dynamic approach to reducing mainframe usage costs without the need for extensive customization and expensive consulting services (hereinafter "Mainframe Cost Capping Solution").

11. In the fall of 2011, BMC began investing a substantial amount of resources to further the development of a Mainframe Cost Capping Solution. These investments included utilizing resources internally at BMC, as well as seeking to leverage potential relationships with third parties, including zIT.

12. In or around the fall of 2011, BMC and zIT began discussing a potential business relationship, in part, to facilitate the development of a Mainframe Cost Capping Solution. zIT was aware during the course of the parties' discussions that BMC was evaluating other

companies in addition to zIT to determine whether they had the resources and know-how to potentially collaborate with BMC to jointly develop a Mainframe Cost Capping Solution.

13. zIT was also aware during the course of the parties' discussions that BMC was evaluating whether BMC should develop its own Mainframe Cost Capping Solution, and that one of the purposes of the parties' discussions was to facilitate BMC's decision-making process with respect to whether to independently develop its own solution or jointly develop a Mainframe Cost Capping Solution with another party.

14. In particular, during the parties' preliminary business discussions in 2011, zIT's Chief Operating Officer, Johannes Peeters, acknowledged in written correspondence to BMC's VP of Solutions Marketing and Customer Support, John McKenny, that he understood that BMC was considering a "build your own" product option. Nevertheless, after further discussions, zIT confirmed that it was interested in continuing discussions with BMC about a potential partnership to jointly develop a Mainframe Cost Capping Solution despite the fact that BMC was considering independently developing its own Mainframe Cost Capping Solution.

15. In November 2011, the parties signed a mutual non-disclosure agreement (the "November 2011 NDA") to allow the parties to evaluate the foregoing options. *See* Exhibit A, attached hereto. To protect against misuse of trade secrets and confidential information, Section 4 of the November 2011 NDA prohibits either party from using the other party's information for any purpose other than to further the business relationship between the parties and for the sole benefit of the disclosing party.

16. As set forth above, prior to and after the parties signed the November 2011 NDA, BMC and zIT agreed that BMC reserved the right to independently develop its own Mainframe Cost Capping Solution at any time either during or after the parties' relationship. That express

reservation of rights regarding independent development was negotiated directly with zIT and is reflected in the parties' agreement. *See* Exhibit A at Sections 3(iv) and 13.

17. In addition to providing for independent development, the November 2011 NDA also prohibits either party from claiming ownership of any information provided by the other party under the agreement, and provides for recovery of attorneys' fees expended in enforcing the party's rights under the agreement. *See* Exhibit A, Sections 6 and 15.

18. After executing the November 2011 NDA, representatives from BMC and zIT attended meetings in Frankfurt, Germany in December 2011, and Houston, Texas in January 2012 to discuss zIT's business operations and existing software solutions. In the January 2012 meeting in Houston, zIT presented a high-level sales presentation and pitch deck of zIT's existing software, the zPriceManager product.

19. The sales presentation contained high-level information about the overall operation of the zPriceManager product. At no point did zIT provide BMC with access to technical information that would have allowed BMC to determine the actual technical operation of the zPriceManager product. BMC also never received access to zIT's backend systems, nor did it receive any engineering specifications, design documents, product manuals, or any other technical information about zIT's software that would have facilitated BMC's development of its own Mainframe Cost Capping Solution.

20. Based on the presentation, BMC's representatives were able to determine that the zPriceManager product was a service-intensive solution that did not provide the types of features or automation that BMC required for its Mainframe Cost Capping Solution.

21. In February 2012, BMC informed zIT that it could not effectively market and sell zPriceManager in its current state, and that zIT would need to further develop the zPriceManager product if the parties' discussions were to continue.

22. To facilitate and expedite the development of the Mainframe Cost Capping Solution, BMC provided zIT with confidential information in March 2012 that contained a detailed roadmap of features and functionality that BMC wanted included in its Mainframe Cost Capping Solution (hereinafter "BMC's Cost Capping Specification").

23. The combination of features and functionality reflected in BMC's Cost Capping Specification were developed by Neil Blagrave, BMC's product manager for iCap at the time, after extensive research and analysis that included information provided by critical mainframe customers and extensive market analysis, including BMC's determination of primary target markets, key market drivers and customer segments, customer pain points and demands for specific solutions, pitfalls of competitive solutions, potential partner acquisitions, and timing issues surrounding product development and market launch.

24. The combination of features and functionality reflected in BMC's Cost Capping Specification was also developed utilizing resources derived from BMC's extensive internal mainframe industry experience.

25. The combination of features and functionality reflected in BMC's Cost Capping Specification provided for the development and sale of a market leading Mainframe Cost Capping Solution that created a competitive advantage for BMC that was not known to the industry.

26. Prior to providing the BMC Cost Capping Specification to zIT, and in view of the sensitive and proprietary information contained therein, BMC communicated its concerns to zIT

about the potential misuse of BMC's Cost Capping Specification in the event the parties were unable to work out an agreement on finalizing a solution.

27. Specifically, John McKenny, BMC's VP of Solutions Marketing and Customer Support, reiterated to zIT's CEO, Johannes Peeters in February 2012 that because BMC intended to develop its own product in the event zIT could not provide the requirements identified by BMC, BMC representatives had concerns about sharing BMC's Cost Capping Specification and overall product roadmap to zIT.

28. Despite BMC's concerns, BMC agreed to provide the specification and other trade secrets and confidential information to zIT, in part, because of the parties' November 2011 NDA.

29. To avoid any doubt about the sensitive and proprietary nature of the information contained in BMC's Cost Capping Specification, the document provided to zIT contained the following designation:

| ***PROPRIETARY NOTICE*** |
| --- |
| This document contains BMC confidential information, which may include trade secrets and business information. Recipient acknowledges that this information has been developed by BMC Software as valuable trade secrets. All information contained herein shall remain exclusive property of BMC Software and shall be disclosed to only persons who have a need to know.<br><br>Recipient agrees not to copy or reproduce in any form any information supplied herein without prior written permission from an authorized representative of BMC Software. Recipient further agrees to provide security for this document to a reasonable degree so that unauthorized disclosure is prevented. |

30. On March 7, 2012, zIT's CEO, Johannes Peeters, confirmed to John McKenny, BMC's VP of Solutions Marketing and Customer Support, that zIT had reviewed the requirements in BMC's Cost Capping Specification and that zIT was working on certain of the requirements from the specification.

31. On March 14, 2012, zIT's CEO, Johannes Peeters, requested a "technical workshop" with BMC to discuss development of the mandatory requirements identified by BMC, more details and "background" regarding the requirements provided by BMC, and a timeline for completion of the requirements.

32. By August 2012, zIT had failed to develop a Mainframe Cost Capping Solution meeting the requirements reflected in BMC's Cost Capping Specification. As a result, BMC made the decision to continue independently developing its own Mainframe Cost Capping Solution. Relying on BMC's Cost Capping Specification, BMC invested additional substantial resources in developing that solution, now known as the Intelligent Capping (iCap) for zEnterprise® solution ("the iCap solution").

33. Subsequent to BMC's decision to develop the iCap solution, and after BMC had begun its own development of the iCap solution, zIT requested a meeting to present its latest software solution called the zDynaCap product ("the December 2012 zDynaCap Product"). This meeting took place in December 2012. As with zIT's presentation of the zPriceManager product, zIT presented only high-level information about the overall features of the December 2012 zDynaCap Product.

34. BMC never received access to zIT's backend systems, nor did it receive any engineering specifications, design documents, product manuals, or any other technical information about zIT's software that would have allowed BMC to determine the actual technical operation or functionality of the December 2012 zDynaCap Product, or that would have facilitated BMC's development of its own Mainframe Cost Capping Solution, such as the iCap solution. The presentation was a sales pitch designed to convince BMC that zIT was on

track with developing a solution, and to keep BMC interested in pursuing a joint collaboration with zIT.

35. Based on the December 2012 meeting, BMC determined that the December 2012 zDynaCap Product did not include any new or additional features that were materially different from the features presented in zIT's prior product, zPriceManager. The December 2012 zDynaCap Product also did not contain the requirements and functionality previously conveyed by BMC to zIT via BMC's Cost Capping Specification and in other prior communications by BMC. In view of zIT's failure to provide an effective and complete solution responsive to BMC's requests, BMC continued development of its own iCap solution, which was substantially underway prior to zIT's presentation in December 2012.

36. In the spring of 2013, zIT encouraged BMC to attend an additional presentation to further discuss the zDynaCap product. Pursuant to representations made by zIT about the inclusion of additional features and functionality in the zDynaCap product, BMC agreed to give zIT another chance to present its proposed software. Prior to the meeting, zIT and BMC executed another mutual-nondisclosure agreement in April 2013 (hereinafter the parties' "April 2013 NDA"). *See* Exhibit B attached hereto.

37. As with the November 2011 NDA, the April 2013 NDA prohibits either party from using the other party's information disclosed under the agreement for any purpose other than evaluating, negotiating, and pursuing a possible business combination or other strategic relationship. *See* Exhibit B, Section 2(c), attached hereto. The April 2013 NDA also expressly reserves both parties' rights to independent development, and prohibits either party from claiming ownership of any information provided by the other party under the agreement. *See* Exhibit B, Sections 1(c) and 5.

38. In June 2013, zIT presented another high-level sales pitch of its latest version of the zDynaCap product to BMC (the "June 2013 zDynaCap Product"). As with its previous presentations, BMC never received access to zIT's backend systems, nor did it receive any engineering specifications, design documents, product manuals, or any other technical information about zIT's software that would have allowed BMC to determine the actual technical operation or functionality of the June 2013 zDynaCap Product or that would have facilitated BMC's development of its own Mainframe Cost Capping Solution, such as the iCap solution.

39. After the conclusion of the June 2013 presentation, zIT inquired with BMC about its interest in the June 2013 zDynaCap Product. Because the June 2013 zDynaCap Product did not provide a better Mainframe Cost Capping Solution than BMC's iCap solution (which BMC had invested substantial resources in developing), and because the zDynaCap product would require significant investment to bring it up to BMC product standards, BMC was not interested in pursuing a business relationship with zIT to collaborate on a Mainframe Cost Capping Solution.

40. Upon information and belief, the June 2013 zDynaCap Product contains BMC's trade secret information and confidential information.[1] At no point did BMC authorize or otherwise give permission to zIT to use the zDynaCap product or BMC's Cost Capping Specification for its own purposes, or to otherwise use any other of BMC's confidential information or trade secret information disclosed by BMC to zIT during the parties' discussions.

[1] When discussing all versions of the zDynaCap product hereinafter, all versions are collectively referred to as "the zDynaCap product." Discovery in this litigation will confirm which versions of zDynaCap developed prior to and after the June 2013 zDynaCap Product contain BMC's trade secrets and confidential information, or were derived therefrom.

41. Upon information and belief, and despite provisions in the parties' November 2011 NDA and April 2013 NDA ("NDAs") expressly prohibiting zIT's use of BMC's trade secrets and confidential information, zIT began marketing and selling the zDynaCap product to its customers without BMC's permission or consent.

42. On March 6, 2013, zIT filed provisional application no. 61/773,555. The provisional application discloses concepts and functionality developed by BMC and contained within BMC's Cost Capping Specification and other confidential information and trade secrets disclosed to zIT by BMC.

43. On September 5, 2013, zIT filed provisional application no. 61/874,052. The provisional application discloses concepts and functionality developed by BMC and contained within BMC's Cost Capping Specification and other confidential information and trade secrets disclosed to zIT by BMC.

44. On March 6, 2014, zIT also filed a patent application that issued as U.S. Patent No. 9,038,090 (the "'090 Patent"). The '090 Patent discloses concepts and functionality developed by BMC and contained within BMC's Cost Capping Specification and other confidential information and trade secrets disclosed to zIT by BMC. Upon information and belief, zIT disclosed such information in the filing of the patent application for the '090 Patent and despite being aware that BMC conceived of certain concepts and functionality disclosed in the '090 Patent, zIT represented to the United States Patent and Trademark Office ("USPTO") that it was the sole and exclusive inventor of the subject matter disclosed in the '090 Patent, when it was not.

45. Upon information and belief, zIT never disclosed to the USPTO BMC's involvement in developing the subject matter disclosed in the '090 Patent.

46. Upon information and belief, zIT also never disclosed the zPriceManager product to the USPTO, despite the fact that the zPriceManager product is the predecessor solution to the zDynaCap product and constitutes prior art to the ‘090 Patent.

47. On June 20, 2014, zIT filed another patent application that issued as U.S. Patent No. 9,904,405 (the “405 Patent”), which also discloses concepts and functionality developed by BMC and contained within BMC’s Cost Capping Specification and other confidential information and trade secrets provided to zIT by BMC. Upon information and belief, despite being aware that BMC conceived of certain concepts and functionality disclosed in the ‘405 Patent, zIT represented to the USPTO that it was the sole and exclusive inventor of the subject matter disclosed in the ‘405 Patent.

48. Upon information and belief, zIT never disclosed BMC’s involvement in developing the subject matter disclosed in the ’405 Patent to the USPTO.

49. Upon information and belief, zIT also never disclosed the zPriceManager product to the USPTO despite the fact that the zPriceManager product is the predecessor solution to the zDynaCap product and constitutes prior art to the ‘405 Patent.

50. The ‘405 patent issued on December 2, 2014, and the ‘090 Patent issued on May 19, 2015. One month after the issuance of the ‘090 Patent, zIT filed suit against BMC in this District alleging that BMC’s iCap solution infringes the Patents-in-Suit.

51. Upon information and belief, zIT filed suit against BMC after deceiving the USPTO into believing that zIT was the sole inventor of the subject matter disclosed in the Patents-in-Suit, and did so with knowledge that BMC is an inventor and owner of the subject matter disclosed in the Patents-in-Suit.

52. Upon information and belief, zIT sought patent protection, prosecuted the Patents-in-Suit, and filed suit against BMC, in part, because of BMC's refusal to collaborate with zIT on a Mainframe Cost Capping Solution.

53. Upon information and belief, zIT filed this suit, in part, to prohibit BMC from using, marketing, and selling the iCap solution.

**COUNT 1 – MISAPPROPRIATION AND MISUSE OF BMC'S TRADE SECRETS AND CONFIDENTIAL INFORMATION IN VIOLATION OF THE DELAWARE TRADE SECRETS ACT, 6 DEL. CODE ANN. §§ 2001, *ET SEQ*.**

54. BMC incorporates each and every allegation contained in Paragraphs 1, 2, 5-17, 20-37, 40-44, 47, 50-53 as though fully set forth herein.

55. BMC has invested substantial time and resources over many years to develop cost optimization enterprise software solutions to help its customers increase the efficiency of their business critical solutions and reduce costs associated with the use of those applications. Those investments included the creation of the iCap solution, which BMC has spent the last three years developing.

56. In the course of developing the iCap solution, BMC developed substantial confidential information and trade secrets related to the iCap solution, including BMC's Cost Capping Specification and other product development plans, technical design plans, operations information, marketing, budgeting and sales strategies, pricing models, business strategies, competitor and market intelligence, and other confidential, trade secret, and proprietary information about the design and function of the iCap solution.

57. In 2011 and 2012, BMC shared certain of its trade secrets and confidential information with zIT, including BMC's Cost Capping Specification.

58. Through its relationship with BMC, zIT also gained insight into BMC's product and market strategies, including primary target markets, key market drivers and customer

segments, customer pain points and demands for specific solutions, pitfalls of competitive solutions, potential partner acquisitions, and timing issues surrounding product development and market launch.

59. BMC enjoyed an advantage over its existing and prospective competitors in the design, development, production, service, marketing, and sale of products and services similar to the iCap solution because of the above-described confidential, trade secret, and proprietary information.

60. BMC's confidential information and trade secrets have independent economic value and are or were not generally known to others who would be able to derive economic value from them.

61. BMC took reasonable steps to preserve the confidentiality of its confidential information and trade secrets, including by executing the NDAs with zIT.

62. Pursuant to the parties' NDAs, zIT had, and continues to have, a duty to keep the information shared by BMC secret, and not to use or disclose such information other than for the benefit of BMC and even then, only with BMC's written authorization.

63. zIT knew it acquired such information under circumstances giving rise to a duty to maintain its secrecy or limit its use. Nevertheless, upon information and belief, zIT has disclosed and/or used BMC's trade secrets and confidential information in a manner adverse to BMC and without the express or implied consent of BMC.

64. Specifically, upon information and belief, zIT used BMC's trade secrets and confidential information to develop the zDynaCap product, and has marketed and sold the zDynaCap product to customers without the consent or authorization of BMC.

65. Upon information and belief, zIT also prepared and filed provisional patent applications and patent applications for the Patents-in-Suit using BMC's trade secrets and confidential information, including BMC's Cost Capping Specification.

66. Upon information and belief, zIT obtained and used BMC's trade secrets and confidential information to sue BMC in order to preclude BMC from using its iCap solution and to coerce BMC to acquire for use zIT's zDynaCap product.

67. Upon information and belief, zIT obtained the proprietary and confidential information described above directly from BMC and not from generally available information or as a result of independent research and development efforts by zIT.

68. As a result of the foregoing, zIT acquired BMC's trade secrets and other proprietary and confidential information described above (a) by using improper means, (b) through a confidential relationship with BMC, and/or (c) under other circumstances giving rise to a duty not to use or disclose such trade secrets and other confidential and proprietary information without BMC's consent, which zIT did not obtain.

69. zIT's actions constitute misappropriation and misuse of BMC's trade secrets and confidential information, and as a direct and proximate result, zIT has obtained benefits from and been unjustly enriched from such use or disclosure of BMC's trade secrets and other confidential and proprietary information, and BMC has sustained economic damages in an amount to be determined at trial.

70. Upon information and belief, zIT's acts of misappropriation and misuse were done willfully and maliciously, entitling BMC to exemplary damages and attorneys' fees.

71. BMC has also suffered irreparable harm as a result of zIT's activities, and will continue to suffer irreparable injury that cannot be adequately remedied at law unless zIT and its

officers, agents, and employees, and all other persons acting in concert with them are enjoined from engaging in any further acts of misappropriation and misuse of BMC's trade secrets and confidential information.

72. BMC is also entitled to a judgment assigning to BMC ownership of all or a portion of the zDynaCap product, the provisional applications related to the Patents-in-Suit, the Patents-in-Suit, any pending applications claiming priority to the provisional applications or Patents-in-Suit, and any other patent applications or intellectual property developed by zIT using trade secrets and confidential provided to zIT by BMC, or that were derived therefrom.

73. To the extent the Court deems appropriate, BMC seeks a reasonable royalty to recover its damages associated with zIT's unauthorized use and disclosure of BMC's confidential information and trade secrets and reflecting the amount by which zIT was unjustly enriched, including, but not limited to, a reasonable royalty on all sales or monies recouped for the sale of use of zDynaCap product, the provisional applications related to the Patents-in-Suit, the Patents-in-Suit, any pending applications claiming priority to the provisional applications or Patents-in-Suit, and any other patent applications or intellectual property developed by zIT using trade secrets and confidential provided to zIT by BMC, or that were derived therefrom.

## COUNT 2 – BREACH OF THE PARTIES' APRIL 2013 NONDISCLOSURE AGREEMENT

74. BMC incorporates each and every allegation contained in Paragraphs 8-17, 21-29, 36-37, 40-44, 47, 50, 55-57, 61-64, 67 and 68 as though fully set forth herein.

75. zIT entered into two separate valid and enforceable mutual non-disclosure agreements with BMC—the November 2011 NDA and the April 2013 NDA.[2]

[2] The April 2013 NDA contains a provision superseding prior agreements between zIT and BMC only as to the "subject matter" covered by the April 2013 NDA. *See* Exhibit B, Section 14. The November 2011 NDA contains a survival provision that states that the protections afforded to confidential information by the November 2011 NDA

76. By entering into these agreements, zIT was afforded access to BMC's trade secrets and confidential information, including BMC's Cost Capping Specification.

77. The April 2013 NDA entered into by zIT expressly prohibited zIT from using or disclosing BMC's information for any reason other than the stated purpose of the agreements, which included evaluating, negotiating, and pursuing a possible business combination or other strategic relationship with BMC to develop a Mainframe Cost Capping Solution for use or acquisition by BMC. The April 2013 NDA also expressly prohibits zIT from asserting or claiming an ownership right to any information provided by BMC pursuant to the April 2013 NDA.

78. Upon information and belief, zIT breached its obligations under the April 2013 NDA by, among other things, using and/or disclosing BMC's proprietary information and trade secrets without permission or authorization in the development, marketing, and sale of the zDynaCap product, and by holding itself out as the sole owner of the features and functionality disclosed in the zDynaCap product.

79. Upon information and belief, zIT also breached its agreements by relying on and disclosing BMC's trade secrets and confidential information, including BMC's Cost Capping Specification, in the preparation and prosecution of the provisional applications related to the Patents-in-Suit, the Patents-in-Suit, and any related patent applications.

80. BMC performed all of its obligations under the parties' NDAs.

---

are only superseded to the extent any subsequent agreement covers the confidential information protected by the November 2011 NDA. *See* Exhibit A, Section 8. To the extent zIT contends that information exchanged between the parties pursuant to the November 2011 NDA is not covered by the parties' April 2013 NDA, the November 2011 NDA remains in full force and effect as to that information, and zIT's improper use and disclosure of BMC's information exchanged under that agreement is a breach of that agreement. BMC expressly reserves its right to pursue zIT's breach of that agreement in the event zIT seeks to avoid injury for breach by claiming the information provided by BMC is covered by the November 2011 NDA only. The November 2011 NDA also remains in full force and effect to the extent the Court determines that zIT fraudulently induced BMC to enter the April 2013 NDA under false pretenses.

81. As a direct and proximate result of zIT's breach of the April 2013 NDA, zIT has been unjustly enriched, and BMC has sustained substantial economic damages and costs, including attorneys' fees and costs associated with defending this suit.

82. BMC is entitled to recover its actual damages in an amount to be determined at trial, as well as reasonable attorneys' fees and costs incurred in enforcing its rights under the April 2013 NDA and in defending this lawsuit.

83. BMC is also entitled to a declaration of ownership of all or a portion of the zDynaCap product, the provisional applications related to the Patents-in-Suit, the Patents-in-Suit, any pending patent applications claiming priority to the provisional applications or Patents-in-Suit, and any other patent applications or intellectual property developed by zIT using trade secrets and confidential information provided to zIT by BMC, or that were derived therefrom.

84. In order to enforce the parties' agreement that all "Confidential Information shall be and remain the property of the disclosing Party" (*see* Exhibit B, Section 5), BMC is also entitled to an order and judgment assigning ownership to BMC of all or a portion of the zDynaCap product, the provisional applications related to the Patents-in-Suit, the Patents-in-Suit, any pending applications claiming priority to the provisional applications or Patents-in-Suit, and any other patent applications or intellectual property developed by zIT using trade secrets and confidential information provided to zIT by BMC, or that were derived therefrom.

**COUNT 3 – FRAUD**

85. BMC incorporates each and every allegation contained in Paragraphs 8-17, 14-17, 21-22, 26-33, 36-38, 40-44, 47, 50-53 as though fully set forth herein.

86. As set forth herein, zIT and BMC executed the November 2011 NDA and the April 2013 NDA, in part, for the purpose of disclosing information and using that information

only for evaluating, negotiating, and pursuing a possible business combination or other strategic relationship.

87. Pursuant to the NDAs, BMC disclosed certain trade secrets and confidential information to zIT, including BMC's Cost Capping Specification. zIT expressly represented to BMC that zIT would not use or disclose BMC's trade secrets and confidential information for any purpose other than evaluating, negotiating, and pursing a possible business combination or other strategic relationship with BMC, and expressly agreed that it would not assert any ownership claim over BMC's trade secrets and confidential information.

88. In or around 2013, zIT engaged in communications with BMC regarding the latest version of its zDynaCap product. In particular, zIT encouraged BMC to attend an additional presentation of the latest version of the zDynaCap product, and asked BMC to execute the April 2013 NDA, in part, to demonstrate the product to BMC.

89. Upon information and belief, zIT arranged this presentation with BMC and sought to secure an additional non-disclosure agreement with BMC under false pretenses.

90. Specifically, upon information and belief, zIT's representatives, including Johannes Peeters, represented to BMC that it would present the latest version of the zDynaCap product to BMC as its contribution to the parties' collaboration efforts and pursuant to the parties' NDAs regarding a possible business relationship. However, upon information and belief, zIT demonstrated the latest version of the zDynaCap product to BMC, in part, so that it could later use that disclosure as leverage against BMC in the event BMC decided not to establish a business relationship with zIT following the presentation.

91. In particular, prior to the execution of the April 2013 NDA and zIT's presentation of the latest version of the zDynaCap product to BMC, zIT filed a provisional patent application

related to the Patents-in-Suit. Upon information and belief, the subject matter disclosed in that application is based on BMC's trade secrets and confidential information. Upon information and belief, zIT filed the provisional application so that it could obtain patent protection for the information disclosed to zIT by BMC so that zIT could assert the Patents-in-Suit against BMC in the event BMC refused to establish a business relationship with zIT.

92. Upon information and belief, zIT also requested that BMC sign an additional NDA so that zIT could later assert that BMC used information disclosed by zIT pursuant to the April 2013 NDA in developing its iCap solution in the event BMC refused to establish a business relationship with zIT.

93. Further, and upon information and belief, zIT made the foregoing representations to BMC about the latest version of the zDynaCap product knowing they were false and incomplete at the time they were made.

94. zIT also intentionally withheld and failed to disclose material information that would have impacted BMC's decisions to continue disclosing confidential and trade secret information to zIT and to continue its business relationship with zIT, including whether to enter into the April 2013 NDA.

95. In particular, upon information and belief, zIT never disclosed to BMC that it had filed a provisional patent application related to the Patents-in-Suit prior to the execution of the April 2013 NDA and the parties' meeting regarding the latest version of the zDynaCap product. Upon information and belief, zIT never disclosed to BMC that it was disclosing the latest version of zDynaCap product to BMC for any other reason than as part of the parties' collaboration, or that it was seeking patent protection based on information provided by BMC for the purpose of

using that information against BMC later in the event BMC refused to continue to establish a business relationship with zIT.

96. Since zIT's presentation of the latest version of zDynaCap to BMC, zIT has used the presentation of zDynaCap to BMC and the filing of the provisional applications related to the Patents-in-Suit and the Patents-in-Suit against BMC. In June 2015, zIT sued BMC for infringing the Patents-in-Suit, which related back to the provisional patent application filed by zIT prior to the execution of the April 2013 NDA.

97. Upon information and belief, zIT made material misrepresentations to BMC and failed to provide the foregoing information to BMC with the intent that BMC rely on those misrepresentations and omissions. BMC did, in fact, rely on those misrepresentations and omissions.

98. In particular, had BMC been aware that zIT was seeking patent protection based on confidential and trade secret information disclosed by BMC to zIT, or that zIT wanted to execute the April 2013 NDA to present to BMC to the latest version of the zDynaCap product for the purpose of using such information against BMC in the event BMC refused to establish a business relationship with zIT, BMC would not have signed the additional April 2013 NDA or attended zIT's presentation of the latest version of the zDynaCap product.

99. zIT had a duty not to make the above-described material misrepresentations.

100. zIT also had to duty to disclose all material facts to BMC and a legal duty to refrain from actively concealing material information from BMC. zIT instead concealed or failed to disclose such material facts, knew that zIT had concealed or failed to disclose such material facts, and zIT concealed or failed to disclose such material facts with an intention to induce BMC to act to continue the business relationship and to refrain from acting to enforce its

rights with respect to BMC's trade secrets and confidential information. BMC was consequently injured as a result of zIT's concealment and failure to disclose material facts.

101. In particular, zIT's active concealment of its plans to seek patent protection on BMC's Cost Capping Specification prevented BMC from exercising its rights to seek injunctive relief under the parties' NDAs to prevent zIT from using BMC's information to obtain patent protection for the Patents-in-Suit.

102. zIT's active concealment also prevented BMC from pursuing any available remedies with the USPTO related to zIT's attempts to seek patent protection with respect to BMC's information.

103. zIT's active concealment also prevented BMC from stopping zIT from gaining a competitive advantage in the market through patent protection and from stopping zIT from unfairly competing with BMC.

104. BMC has suffered economic harm as a result of zIT's fraudulent misrepresentations, inducements, and omissions, including by having to defend against this lawsuit and to compete with zIT based on information provided by BMC to zIT, among other harm. BMC seeks to recover all of its actual damages and costs associated with zIT's conduct, as well as exemplary damages.

## COUNT 4—DECLARATION OF OWNERSHIP AND ASSIGNMENT OF THE ZDYNACAP PRODUCT, THE PATENTS-IN-SUIT AND RELATED APPLICATIONS, AND ANY OTHER ASSETS OR INFORMATION CONTAINING BMC'S TRADE SECRETS OR CONFIDENTIAL INFORMATION

105. BMC incorporates each and every allegation contained in Paragraphs 5, 7-12, 14-17, 20-31, 35-37, 39-44, 47, and 50 as though fully set forth herein.

106. Through purposeful violations of the parties' agreements and other acts described herein, zIT has wrongfully gained property and benefits that rightfully belong to BMC.

107. Specifically, upon information and belief, zIT used BMC's trade secrets and confidential information (including BMC's Cost Capping Specification) to develop the zDynaCap product, and has marketed and sold the zDynaCap product to customers without the consent or authorization of BMC.

108. Upon information and belief, zIT also prepared and filed provisional patent applications related to the Patents-in-Suit and the applications for the Patents-in-Suit using BMC's trade secrets and confidential information, including BMC's Cost Capping Specification.

109. Pursuant to the parties' NDAs and legal and equitable remedies, BMC has a rightful ownership claim to all or portions of the zDynaCap product, the provisional patent applications related to the Patents-in-Suit, the Patents-in-Suit and any pending patent applications claiming priority to the provisional patent applications or Patents-in-Suit, and any other assets or information that include or were derived from BMC's trade secrets and confidential information.

110. Upon information and belief, zIT has been unjustly enriched, and has unjustly retained benefits that rightfully belong to BMC.

111. BMC's legal and equitable remedies require that the property and benefits wrongfully gained by zIT, including all works taken from BMC, all derivatives thereof, and all earnings and other benefits derived from BMC's trade secrets and confidential information be held in constructive trust for BMC, and that all rights, title, and interest be transferred to BMC.

112. BMC also demands a declaration and judgment assigning to BMC ownership of all or a portion of the zDynaCap product, the provisional applications related to the Patents-in-Suit, the Patents-in-Suit, any pending applications claiming priority to the provisional

applications or Patents-in-Suit, and any other applications or intellectual property developed by zIT using trade secrets and confidential provided to zIT by BMC, or that were derived therefrom.

113. The Court has authority to grant the relief requested by BMC pursuant to 28 U.S.C. § 2201 and 10 Del. C. § 6501.

114. zIT holds itself out as the sole owner of the zDynaCap product and the sole inventor of the Patents-in-Suit. BMC contends that it also has an ownership stake in the zDynaCap product and the Patents-in-Suit. Accordingly, a valid and justiciable controversy exists between BMC and zIT, and the controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in favor of BMC.

**COUNT 5 – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS**

115. BMC incorporates each and every allegation contained in Paragraphs 5-11, 14, 16, 26-29, 32, 40-41, 51-53, 86-101 as though fully set forth herein.

116. Economic business relationships exist between BMC and its actual and prospective customers. In particular, BMC maintains cooperative relationships with its existing customers that involve the development of specific, unique technologies tailored to fit BMC's customers' needs.

117. Upon information and belief, zIT has engaged in wrongful and improper conduct designed to interfere with or disrupt BMC's relationships with its actual and prospective customers, including by, among other things, using and/or disclosing BMC's trade secrets and confidential information to gain a head start in the development, marketing, and sale of zIT's zDynaCap product to customers seeking an IBM cost capping solution. Upon information and belief, zIT also filed patent applications for the Patents-in-Suit based on information provided by

BMC in order to sue BMC for patent infringement so that it could preclude BMC from participating in the relevant marketplace.

118. Upon information and belief, the actions of zIT were intentional and carried out for the purpose of disrupting BMC's relationships with its actual and prospective customers. zIT is continuing to disrupt BMC's business relationships with its prospective customers by promoting this lawsuit to potential customers, including by providing the following information on its website:



[3]

119. As a result of the intentional interference by zIT with BMC's prospective economic relations, BMC's relationships with its prospective customers were, in fact, disrupted and BMC has been damaged as a result. For example, a customer recently informed BMC that it could not engage in further discussions regarding the purchase of BMC's iCap solution because of the lawsuit filed by zIT. Upon information and belief, zIT has also approached at least one of

[3] *See* http://www.zit-consulting.com/en/zit-consulting-erhebt-klage-geben-bmc-software.

BMC's longstanding customers and attempted to sell zDynaCap in place of BMC's iCap solution.

120. In addition, the conduct of zIT has permanently and irreparably harmed BMC. BMC is therefore entitled to injunctive relief.

121. Upon information and belief, the acts and conduct intended to disrupt BMC's prospective economic relations were carried out fraudulently, willfully, maliciously, and with wanton disregard of BMC's rights, thereby entitling BMC to compensatory damages and punitive damages to be proven at trial.

**COUNT 6 – DECLARATION OF IMPROPER INVENTORSHIP AND INVALIDITY AND UNENFORCEABILITY OF THE PATENTS-IN-SUIT**

122. BMC incorporates each and every allegation contained in Paragraphs 97-106 of BMC's Answer and Affirmative Defenses and each and every allegation contained in Paragraphs 5, 7-11, 22-31, 39-40, 42-45, and 47-48, and 51 of BMC's Counterclaims as though fully set forth herein.

123. 35 U.S.C. § 101 provides that "Whoever ***invents*** or discovers any new and useful process, machine, manufacture, or composition of matter, or any new or useful improvement thereof, may obtain a patent therefor . . . ."

124. Upon information and belief, zIT was not the original and first inventor of the subject matter disclosed in the Patents-in-Suit, nor did zIT first discover all or a substantial part of the subject matter disclosed in the Patents-in-Suit. Upon information and belief, the subject matter disclosed in the Patents-in-Suit was created entirely or in substantial part by BMC and disclosed to zIT in BMC's Cost Capping Specification and other trade secrets and confidential information provided to zIT pursuant to the November 2011 NDA and the April 2013 NDA.

125. zIT holds itself out as the sole inventor of the Patents-in-Suit. BMC contends that it is the sole or joint inventor or owner of the Patents-in-Suit. Accordingly, a valid and justiciable controversy exists between BMC and zIT, and the controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in favor of BMC that zIT is not the sole inventor of the Patents-in-Suit and that the Patents-in-Suit are invalid for improper inventorship.

**COUNT 7 – CORRECTION OF INVENTORSHIP OF THE PATENTS-IN-SUIT**

126. BMC incorporates each and every allegation contained in Paragraphs 99-100 of BMC's Answer and Affirmative Defenses and each and every allegation contained in Paragraphs 5, 7-11, 22-31, 39, 41-45, and 48-52 of BMC's Counterclaims as though fully set forth herein.

127. Upon information and belief, zIT was not the inventor of the subject matter disclosed in the Patents-in-Suit, nor did zIT first discover all or a substantial part of the subject matter disclosed in the Patents-in-Suit.

128. Upon information and belief, the subject matter disclosed in the Patents-in-Suit was created entirely or in substantial part by Neil Blagrave and other representatives of BMC and was disclosed to zIT in BMC's Cost Capping Specification pursuant to the parties' non-disclosure agreements.

129. In the event the Court finds that the Patents-in-Suit are not invalid for improper inventorship, BMC seeks an order, pursuant to 35 U.S.C. § 256, directing the USPTO to issue a certificate correcting the named inventors of the Patents-in-Suit to include any representatives at BMC the Court determines are entitled to be included as inventors of the Patents-in-Suit.

**COUNT 8 – DECLARATION OF NON-INFRINGEMENT OF THE PATENTS-IN-SUIT**

130. BMC incorporates each and every allegation contained in Paragraphs 24-93, 101-102, 107 and 110 of BMC's Answer and Affirmative Defenses as though fully set forth herein.

131. zIT alleges in its Complaint that it is the owner of the Patents-in-Suit, and that BMC has directly infringed, induced infringement, contributed to infringement or willfully infringed one or more claims of the Patents-in-Suit.

132. BMC contends that zIT is not the rightful owner of the Patents-in-Suit and that it does not infringe and has not directly infringed, induced infringement, contributed to infringement, or willfully infringed any valid claim of the Patents-in-Suit, either literally or under the doctrine of equivalents.

133. Accordingly, a valid and justiciable controversy exists between BMC and zIT as to whether BMC infringes any valid claims of the Patents-in-Suit. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in favor of BMC.

## COUNT 9 – DECLARATION OF INVALIDITY OF THE PATENTS-IN-SUIT

134. BMC incorporates each and every allegation contained in Paragraphs 96-100, 103-106, and 108-109 of BMC's Answer and Affirmative Defenses as though fully set forth herein.

135. zIT alleges in its Complaint that it is the owner of the Patents-in-Suit.

136. In addition to the allegations set forth herein, BMC further contends that one or more claims of the Patents-in-Suit are invalid for failure to meet provisions of the Patent Laws of the United States, 35 U.S.C §§ 101, 102, 103, and/or 112.

137. Accordingly, a valid and justiciable controversy exists between BMC and zIT as to whether the Patents-in-Suit are invalid. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in favor of BMC.

## JURY DEMAND

BMC demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, BMC denies that zIT is entitled to any of the relief sought in its prayer or to any relief whatsoever. BMC further respectfully requests that this Court enter judgment in favor of BMC, and against zIT, as follows:

A. That zIT be denied all relief requested in its Complaint;

B. That zIT's Complaint be dismissed with prejudice in its entirety and that zIT take nothing;

C. That BMC is entitled to compensatory damages in an amount to be determined at trial resulting from zIT's misuse and misappropriation of BMC's trade secrets and confidential information, breach of contract, fraud and tortious interference with BMC's prospective business relations;

D. For a declaration that BMC is the rightful owner of the zDynaCap product, the provisional patent applications related to the Patents-in-Suit, the Patents-in-Suit, any pending patent applications claiming priority to the provisional patent applications or Patents-in-Suit, and any patent applications or other intellectual property developed by zIT using trade secrets and confidential information provided to zIT by BMC, or that were derived therefrom;

E. For a judgment assigning ownership of all or a portion of the zDynaCap product, the provisional patent applications related to the Patents-in-Suit, the Patents-in-Suit, any pending patent applications claiming priority to the provisional patent applications or Patents-in-Suit, and any patent applications or other intellectual property developed by zIT using trade secrets and confidential information provided to zIT by BMC, or that were derived therefrom.

F. For a declaration of improper inventorship of the Patents-in-Suit and that the Patents-in-Suit are invalid and unenforceable for improper inventorship;

G. That inventorship of the Patents-in-Suit be corrected to reflect that BMC's and its representatives are joint or sole inventors and owner of the Patents-in-Suit in the event the Patents-in-Suit are not declared invalid for improper inventorship;

H. For a declaration that BMC has not and does not infringe, either directly or indirectly, any valid claims of the Patents-in-Suit;

I. For a declaration that each and every claim of the Patents-in-Suit are invalid;

J. For a judgment and order finding this to be an exceptional case and requiring zIT to pay the costs of this action (including all disbursements) and attorneys' fees as provided by 35 U.S.C. § 285;

K. For an injunction permanently prohibiting zIT and its officers, agents, servants, employees, and all persons acting in concert with zIT, from directly or indirectly:

   a. Reproducing, distributing, publishing, placing in the market, or otherwise using or disclosing, in whole or in part, BMC's trade secrets and confidential information, or any derivative work thereof;

   b. Manufacturing, producing, offering for sale, selling, or conveying to any person any products, systems or services produced, manufactured, or marketed using BMC's trade secrets, confidential information, or other proprietary information;

L. For an award of exemplary damages, punitive damages, and enhanced damages as permitted by law;

M. For costs of suit and reasonable attorneys' fees incurred herein;

N. That such other and further relief be awarded as the Court may deem just and proper.

Dated: February 11, 2016

Respectfully submitted,

*/s/ Michael Chibib*
Michael Chibib, Esq. (*Pro Hac Vice)*
Texas Bar Number: 00793497
email: michael.chibib@pillsburylaw.com
Conor M. Civins, Esq. (*Pro Hac Vice)*
Texas Bar Number: 24040693
email: conor.civins@pillsburylaw.com
Matthew K. Gates, Esq. (*Pro Hac Vice)*
Texas Bar Number: 24069770
matthew.gates@pillsburylaw.com
David N. Patariu, Esq. (*Pro Hac Vice)*
Texas Bar Number: 24074858
david.patariu@pillsburylaw.com
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
401 Congress Avenue, Suite 1700
Austin, TX 78701
Phone: (512) 580-9600
Fax: (512) 580-9601

and,

T. Todd Pittenger, Esq.
Florida Bar No.: 0768936
email: todd.pittenger@akerman.com
Kelly J.H. Garcia, Esq.
Florida Bar No.: 0694851
email: kelly.garcia@akerman.com
**AKERMAN LLP**
420 South Orange Avenue, Suite 1200
Orlando, FL 32801-4904
Phone: (407) 423-4000
Fax: (407) 843-6610

***Counsel for Defendant, BMC Software, Inc.***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 11, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all attorneys of record.

*/s/ Michael Chibib*
Michael Chibib